**SUNRAY DX OIL COMPANY, Plaintiff,**

v.

**The VICKERS REFINING CO., Inc.,**
Defendant.

No. 15805-2.

United States District Court
W. D. Missouri, W. D.

June 11, 1968.

Watson, Ess, Marshall & Enggas, Kansas City, Mo., Hugh B. Cox, Washington, D. C., J. Paul Greve, Tulsa, Okl., for plaintiff.

Stinson, Mag, Thomson, McEvers & Fizzell, Kansas City, Mo., for defendant.

OPINION

COLLINSON, District Judge.

Declaratory judgment action in which plaintiff asks for a judgment that a contract between the parties is void. This contention is based solely on the grounds that the terms of the contract violate the federal anti-trust laws. Jurisdiction lies in this Court under the provisions of Sections 1331, 1332 and 1337 of Title 28, United States Code.

Plaintiff is a "major" oil company which produces and refines crude oil and

sells gasoline and other petroleum products in a number of states. Defendant is an "independent" oil company which markets gasoline and other petroleum products in five midwestern states, in all of which plaintiff also operates.

The two companies are direct competitors in the sale of "branded" gasoline under their respective brand names. The sale of "branded" gasoline is conducted in an established manner. "Branded" jobbers purchase the gasoline from the oil company at various delivery points and serve a market area contiguous to the delivery points. Most delivery points are on pipe lines. Some of the jobbers are "company-owned" and many are independent enterprises, but, in either case, the pricing system is identical, and the jobber's discount is ordinarily three and one-half cents a gallon. The jobber sells and delivers the gasoline to "branded" filling stations, which retail it to the consumer under the brand name.

"Independent brands" of gasoline generally sell at the retail level at a price two cents a gallon less than "major brands." The only definition offered in evidence of the distinction between a "major" and "independent" oil company was that a major receives two cents a gallon more for its brand because of national promotion and public acceptance.

The contract in question is a ten-year supply contract dated March 19, 1963, in which plaintiff agreed to sell and defendant to buy gasoline. The defendant agreed to buy a minimum specified quantity each year, and plaintiff agreed to supply up to a maximum specified quantity each year. To understand the pricing provisions of this contract it is necessary to summarize the negotiations which preceded its consummation.

In 1962 the defendant Vickers was in financial difficulties. It was losing money and was heavily in debt to a New York bank. Its principal asset was a refinery in Kansas which it owned and operated. The bank had a financial study made by an accounting firm which reported the operation of the refinery was unprofitable, and it would have to be modernized and expanded (by a large capital expenditure) or closed.

Before closing the refinery the management of Vickers, and the creditor bank, desired to contract for a long term supply of gasoline. With this end in view, Vickers commenced negotiations with the plaintiff Sunray.

Vickers sought a contract which would assure a continuous supply of gasoline over a long period of time at a price which would assure them a minimum profit of one and one-half cent a gallon on "regular" gas (more on premium). Sunray agreed in principal to this type of contract. The parties attempted to work out a pricing formula that would achieve this result. The initial draft provided for a pricing formula based on the American Oil Company dealer-tank wagon price in each market. The dealer tank wagon price (referred to as DTW price) is the price the service station pays the jobber, and it fluctuates from market to market and from one time to another. Every automobile driver is familiar with so-called "gas wars" which seem to always start gradually and end suddenly.

Basically, this agreed formula provided that from the DTW price there would be deducted freight, net jobber margin, and one and one-half cent margin for Vickers, which would leave the net price which Vickers would pay Sunray. It was further agreed that the "net jobber margin" used in this calculation would be the prevailing competitive jobber margins at the time at such destination.

Under this formula Vickers would be able to buy gasoline and resell it in each market at a competitive price, and be assured of a one and one-half cent margin regardless of widely fluctuating market prices. Of course, Vickers could resell at less than the competitive price and thus reduce its margin, because under the price formula, Vickers price-cutting would not change the price paid Sunray.

But the parties concluded that this formula was too complicated. It in-

volved the keeping of additional records, not ordinarily kept by oil companies, and it further involved a complicated accounting system to arrive at the price.

Vickers proposed that the formula be changed so that Vickers' margin would be based on Vickers' actual jobber price charged, adjusted for special deals which were not like competitive practice or industry practice. Sunray officials felt that this provided a much simpler accounting system. Drafting a provision for the computation of Sunray's price based on the "average realization" each month by Vickers was easily accomplished. But, of course, Sunray could not allow Vickers to cut the price of its branded gasoline to any level it wished and still receive a guaranteed margin. In addition, Vickers had stated that if the contract was executed it planned to acquire new jobbers, and Sunray feared it might do this by reducing prices, which would lower the price Sunray received. Sunray had studied and was satisfied with Vicker's pricing policy in existing markets. A clause was therefore drafted providing that if Vickers acquired any new accounts on a price basis lower than competition in that market, Vickers would notify Sunray, which would have the option of excluding the realizations from those accounts from the calculations of Vickers' average realization. In other words, Vickers would pay for that gasoline at a price calculated from realization in markets in which it did not sell below competition.

There were various drafts with modifications and changes until, in the final contract, the disputed paragraph which Sunray claims voids the agreement reads as follows:

"(d) Vickers' average realization per gallon for all branded regular and premium grade gasoline shall be the average price actually received by Vickers from its jobbers (or the equivalent charged to service stations operated by Vickers or by a subsidiary or an affiliate of Vickers) excluding all motor fuel, sales and use taxes, transportation, loading charges and place differentials in product exchanges.

"It is the intention of the parties that Vickers' prices for its branded regular and premium grade gasoline actually charged to its jobbers and to service stations, operated by Vickers, by a subsidiary, or by an affiliate, will be no lower than the prices to branded jobbers of one or more of Vickers' principal competitors. In the event that Vickers acquires a customer on a price basis which does not conform to the foregoing, Sunray shall be so informed by Vickers and shall have the option of excluding the prices Vickers actually receives from its sales to such customer in computing Vicker's average realization per gallon for branded gasoline."

The evidence disclosed that attorneys for Sunray experienced in anti-trust law approved this provision without any question being raised of anti-trust violation. At least one of Sunray's negotiating employees and several of Vickers' negotiators testified that the entire intention of the parties was that Vickers could resell at any price it fixed, but the price it paid Sunray would be based on the competitive jobber price in that particular market.

One of Sunray's employees, a cost and pricing economist who had participated in the negotiation of the contract from the outset, was placed in charge of the administration of the contract for Sunray, and a vice-president of Vickers was made responsible for administration for Vickers. For the first year of operation under the contract both parties concurred in interpreting the contract to mean that Sunray's price was arrived at from Vickers' jobber price, but that if the jobber price to any "existing" (at the date of the contract) jobber was lower than competition, the competitive jobber price in that market would be used. If the price was under competition to a "new" account, that price would be excluded in arriving at "average realization." Written memorandums exchanged between the parties

clearly indicated that Sunray claimed no right to demand that Vickers raise any prices which might be under competition, either in the case of "existing" or of "new" accounts.

It is noteworthy that the contract contained another provision using the phrase "it is the intention of the parties." This was concerned with transportation charges. Under the price formula, transportation charges from the point Sunray delivered to Vickers' jobber were deducted from the price received by Vickers in determining the net-jobber price. It made no difference to Vickers where the gasoline was delivered to them, but it did affect Sunray's return. Therefore the contract provided—

"It is the intention of the parties that overall transportation costs shall be minimized insofar as feasible, and to that end Sunray will make gasoline available at as many supply points as is possible via pipe line terminals and exchanges."

The parties in actual practice interpreted this clause to mean that if Vickers took delivery of gasoline from a "nonpreferential" point, it could only deduct the transportation charge from the preferential point in calculating average realization; and prices were calculated, billed and paid under this interpretation.

Meanwhile the economic picture in the gasoline business was changing. Before entering into the contract Sunray received a report from a company economist that the proposed contract would yield $200,000 more income annually than wholesaling the gasoline on the open market. During 1964 Sunray received a price less than Sunray's economist reported was a break-even price. In 1965 the price improved somewhat, but the price paid by Vickers was still less than the price that could have been received elsewhere.

In early 1965 Sunray's comptroller prepared a memorandum for management in which it was estimated that Sunray would increase its net income by more than ten million dollars over the period of the balance of the contract if the contract could be cancelled. In July of 1965 Sunray's president notified Vickers' president that the contract violated the anti-trust laws and would have to be terminated. Vickers immediately agreed to amend the disputed paragraph to clearly set out the pricing practice which the parties had followed under their mutual interpretation of the contract, but this offer was refused. It is clear, and admitted by plaintiff, that such an amendment could have been made, but plaintiff insisted that the contract be cancelled and a new three-year contract executed. When defendant refused, this suit was filed.

■ The defendant introduced evidence that cancellation of this contract (now that it has dismantled its refinery) would cause financial ruin of Vickers. Of course, if the contract constitutes either horizontal or vertical price fixing in violation of the Sherman Act it should be nullified regardless of the financial hardship resulting to either of the parties to the contract.

The plaintiff contends that the wording of the clause in question is plain, unambiguous, and capable of only one construction, and that the Court cannot receive or consider evidence concerning the intent of the parties in drafting the contract or the interpretation placed upon it by the parties in performing the contract.

However, this Court does not feel that this clause, even taken out of context, is that unambiguous. It is an unusual contractual provision in that it contains no promise or covenant, but simply a statement of intent with no provision for enforcement or penalty for breach if the expressed intent is not followed. The undisputed fact that the plaintiff, for over a year, in the performance of a contract involving millions of dollars, placed a different interpretation on these words than the interpretation it now urges, is strong evidence of ambiguity.

■ If ambiguity exists, the Court must examine the intention of the parties. The evidence on this point clearly shows that there was no intention by

either party to afford the seller any measure of control over the buyer's resale price. There was no intention to violate the provisions of the Sherman Act or to avoid or evade the purpose of that law.

■■ It is axiomatic that if a contract is subject to two interpretations, one lawful and one unlawful, the courts will enforce the lawful interpretation. The wisdom of that ancient rule is well illustrated by this case. The interpretation originally followed by the parties as to the computation of Vickers' "average realization" as to both "existing" and "new" customers, and the further interpretation that Sunray had no right of control over Vickers' resale price is lawful, does not violate the federal antitrust laws, and is declared to be the correct interpretation of the disputed clause.

This memorandum will serve as findings of fact and conclusions of law under Rule 52(a) Fed.R.Civ.P.

Defendant's counsel are directed to file and serve on plaintiff's counsel a proposed form of declaratory judgment within twenty days. Plaintiff's counsel shall file any objections to the proposed order within ten days after such service.