**SUN OIL COMPANY, Appellant,**

v.

**The VICKERS REFINING COMPANY,**
Inc., Appellee.

No. 19422.

United States Court of Appeals
Eighth Circuit.

Aug. 5, 1969.

384

Hugh B. Cox, of Covington & Burling, Washington, D. C., for appellant, Charles A. Miller, Washington, D. C., and Carl E. Enggas and Colvin A. Peterson, Jr., of Watson, Ess, Marshall & Enggas, Kansas City, Mo., were on the brief.

E. Houston Harsha, of Kirkland, Ellis, Hodson, Chaffetz & Masters, Chicago, Ill., for appellee, Hammond E. Chaffetz, Fred H. Bartlit, Jr., and Frank Cicero, Jr., Chicago, Ill., and Lawrence R. Brown, of Stinson, Mag, Thomson, McEvers & Fizzell, Kansas City, Mo., were on the brief.

Before BLACKMUN, GIBSON and BRIGHT, Circuit Judges.

BRIGHT, Circuit Judge.

In 1963, Sunray DX Oil Company[1] (Sunray) agreed to supply gasoline to a competitor, Vickers Refining Company, for a period of at least ten years. In December of 1965, Sunray, asserting that the agreement provided for price fixing in violation of § 1 of the Sherman Act,[2] sought a declaratory judgment that it was void and unenforceable. The trial court declared the contract to be valid and Sunray appeals. The opinion below is reported sub nom. Sunray DX Oil Co. v. Vickers Refining Co., 285 F.Supp. 403 (W.D.Mo.1968). We affirm.

Sunray is a "major" oil company operating nationally in the refinement and distribution of petroleum products. Vickers, an "independent" oil company, markets gasoline through fewer outlets in a more restricted area. The two companies are direct competitors in the sale of brand-name gasolines in the states of Missouri, Kansas, Iowa, Nebraska, and Oklahoma. Prior to the execution of the contract in question, Vickers obtained gasoline primarily from its own refinery located in Potwin, Kansas. It distributed its gasoline through local jobbers, certain of which were owned or controlled by Vickers. All resold the gasoline to service stations for sale to the public under one of Vickers' brand-names.

Vickers experienced financial difficulties in 1962 partly because its Potwin refinery had become obsolete and inefficient. It sought to resolve its financial problems by obtaining an alternate source of gasoline, which would enable it to remodel or phase out the unprofitable refinery. During late 1962 and early 1963, Vickers negotiated with Sunray for a long-term supply of gasoline. Agreement was reached and a written document was executed on March 19, 1963. The contract specified that, during a ten-year primary term, Sunray would supply gasoline to Vickers up to a specified maximum amount each year and that Vickers was obligated to purchase a specified minimum amount, the beginning minimum being sixty million gallons. Further, contemplating that Vickers might close its refinery, the agreement permitted Vickers to increase its purchase by an additional thirty million gallons of gasoline during the first year following the close of its refinery.[3]

Vickers had been seeking a pricing arrangement which would enable it to sell the purchased gasoline competitively in all markets and at the same time guarantee it a minimum profit on each gallon. During negotiations, Vickers and Sunray reached an early understanding that Vickers would be entitled to a one and one-half cent minimum margin on every gallon of regular gasoline supplied (two and one-half cents on premium gasoline). A formula had to be devised which would take in account the fluctuating price of gasoline in the various market areas and yet insure Vickers its minimum margin of one and one-half cents per gallon.

The pricing agreement finally agreed upon is contained in section 2 of the contract. Subsections (a)–(c) provide that Vickers' price to Sunray would be based on the amount Vickers received from its jobbers for the gasoline. A monthly average (average realization) was to be used to offset fluctuation of the jobber prices in the various areas. In addition to Sunray's freight cost to the point of delivery, Vickers was to pay Sunray the average realization from its jobbers less the guaranteed one and one-half cent

1. Sunray DX Oil Company has, since the time of the trial, merged into Sun Oil Company and this appeal is taken by Sun Oil. For convenience, appellant will be referred to as Sunray.

2. Section 1 of the Sherman Act, 15 U.S.C. § 1, reads in pertinent part:
"Every contract, combination in the form of trust or otherwise, or conspira-

cy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal * * *"

3. In fact, Vickers did close its refinery during 1964.

minimum margin per gallon on regular grade gasoline. If Vickers' average realization was greater than 11.5 cents per gallon, then Vickers' minimum margin was subject to adjustment upward.[4]

The parties' dispute centers around subsection (d) involving the mechanics for computing Vickers' average realization:

"(d) Vickers' average realization per gallon for all branded regular and premium grade gasoline shall be the average price actually received by Vickers from its jobbers (or the equivalent charged to service stations operated by Vickers or by a subsidiary or an affiliate of Vickers) excluding all motor fuel, sales and use taxes, transportation, loading charges and place differentials in product exchanges.

*It is the intention of the parties that Vickers' prices for its branded regular and premium grade gasoline actually charged to its jobbers and to service stations operated by Vickers, by a subsidiary, or by an affiliate, will be no lower than the prices to branded jobbers of one or more of Vickers' principal competitors. In the event that Vickers acquires a customer on a price basis which does not conform to the foregoing, Sunray shall be so informed by Vickers and shall have the option of excluding the prices Vickers actu-ally receives from its sales to such customer in computing Vickers' average realization per gallon for branded gasoline.*" (Emphasis added.)

This provision has given rise to the following issues:

(1) Sunray contends that the second paragraph of the subsection (d), the intention clause, is a clear and unambiguous expression of a price-fixing agreement in that Vickers agreed not to resell the gasoline at prices lower than those of its competitors.

(2) Vickers contends that the contract is not clear, that the provisions of subsection (d), as well as other parts of the contract, create an ambiguity of intent, and that the trial court was correct in referring to all the provisions of the contract as well as to extrinsic evidence in interpreting the contract to be a lawful one.

(3) Sunray further asserts that, even as interpreted by the trial court, the contract contravenes the Sherman Act.

## I.

■■ Sunray asserts that the intention clause of subsection (d) is an unambiguous expression of an agreement to fix or maintain prices. A contract is ambiguous if reasonably susceptible of more than one construction, and the question of whether an ambiguity exists is a matter of law for the court. East-

4. The price computation under the agreement is illustrated by the following simplified examples relating to regular gasoline:

"Situation (1) Vickers' average resale price    11.5¢/gal.
              Less 1.5¢ margin                  1.5¢/gal.
              Price Vickers pays DX            10.0¢/gal.
 Situation (2) Vickers' average resale price    10.0¢/gal.
              Less 1.5¢ margin                  1.5¢/gal.
              Price Vickers pays DX             8.5¢/gal.
 Situation (3) Vickers' average resale price    12.4¢/gal.
              Less 1.5¢ margin                  1.5¢/gal.
              DX price before margin recomputation  10.9¢/gal.

In Situation (3) the computed price to DX is greater than 10¢, so Vickers' 1.5¢ margin is increased by 0.6¢ (⅔ of the difference between 10.0¢ and 10.9¢) to 2.1¢ and Vickers pays DX as follows:

              Vickers average resale price      12.4¢/gal.
              Less recomputed margin             2.1¢/gal.
              Price Vickers pays DX             10.3¢/gal."

mount Constr. Co. v. Transport Mfg. Equip. Co., 301 F.2d 34, 41 (8th Cir. 1962); Minnesota Amusement Co. v. Larkin, 299 F.2d 142, 145 (8th Cir. 1962); Whiting Stoker Co. v. Chicago Stoker Corp., 171 F.2d 248, 250–251 (7th Cir. 1948), cert. denied, 337 U.S. 915, 69 S.Ct. 1155, 93 L.Ed. 1725 (1949). In determining whether there is an ambiguity, it is proper to examine the disputed language in the context of the entire agreement. United States for Use of Bachman & Keffer Construction Co. v. H. G. Cozad Constr. Co., 324 F.2d 617 (10th Cir. 1963); Harrison Sheet Steel Co. v. Morgan, 268 F.2d 538 (8th Cir. 1959); Sterneck v. Equitable Life Ins. Co., 237 F.2d 626 (8th Cir. 1956). And evidence relating to prior negotiations and other circumstances surrounding the making of the contract are to be considered in determining whether the contract is ambiguous. Restatement of Contracts, §§ 230, 242.[5]

In the context of the entire agreement, subsection (d) appears as part of the formula devised to calculate Vickers' price to Sunray. The subsection attempts to define the mechanics to be used in determining Vickers' average realization, which is the basic price upon which all the other calculations depend. The average realization method was inserted into the contract to replace a formula, discussed by the parties in prior negotiations, in which Vickers' price to Sunray was to be based in part on the American Oil Company dealer-tank wagon (DTW) price in each market. The dealer-tank wagon price is the price at which the American Oil Company jobbers sell gasoline to American Oil Company service stations. In this proposal, the price to be paid Sunray for the gasoline was to be calculated by deducting from the DTW price the discount Vickers actually gave to its own jobbers, transportation costs, and the guaranteed margin. The proposal stated that Vickers' jobber discounts were to be no greater than the prevailing competitive jobber margins allowed by major oil companies in the various market areas. Thus, Vickers was to be able to grant jobber discounts greater than the prevailing competitive discount, but its accounting to Sunray would be adjusted upward to reflect the competitive price.

In light of the prior negotiations and the context in which the disputed provision appears, we feel that it is not clear whether the intention clause of section 2(d) embodies an accounting procedure designed to insure Sunray a minimum return (minimum being the prevailing competitive jobber price), or whether it constitutes contract control of Vickers' resale price. The trial court correctly found the clause to be ambiguous.

## II.

Once a contract is determined to be ambiguous or obscure, it is open to inter-

5. Restatement of Contracts, § 230 reads:
   "The standard of interpretation of an integration, except where it produces an ambiguous result, or is excluded by a rule of law establishing a definite meaning, is the meaning that would be attached to the integration by a reasonably intelligent person acquainted with all operative usages and knowing all the circumstances prior to and contemporaneous with the making of the integration, other than oral statements by the parties of what they intended it to mean."
   § 242 reads:
   "Previous negotiations between parties to an integrated agreement, whether the negotiations relate to that agreement or to another, are admissible to show that the agreement has any meaning which is not impossible under the standard stated in § 230, though that meaning would not otherwise have been given to the agreement."
   Comment A to this section provides in part that: "Even where the writing is not ambiguous on its face, the circumstances under which the parties contract may be looked at to establish an ambiguity, as well as to indicate the proper choice of possible meanings".

pretation. The late Judge Gardner articulated the rule thusly:

"Where there is obscurity or ambiguity, however, the language used should be read in the light of all the surrounding facts and circumstances, including the acts of the parties indicating what interpretation was placed upon it by the parties themselves. Contemporaneous exposition of the contract is entitled to great, if not controlling, influence in ascertaining the intention of the parties." Pitcairn v. American Refrigerator Transit Co., 101 F.2d 929, 936–937 (8th Cir. 1939), cert. denied, 308 U.S. 566, 60 S.Ct. 78, 84 L.Ed. 475 (1939) (approved and quoted in H. K. Porter Co. v. Wire Rope Corp. of America, 367 F.2d 653, 660)) 8th Cir. 1966).

In resolving the ambiguity in section 2 (d), the trial court appropriately considered evidence relating to the intent of the parties in entering into the contract, and their interpretation of it during the first year of operation.

Trial Judge Collinson found that the parties intended to allow Vickers to resell the gasoline at any price it desired but that its price to Sunray would be calculated from the competitive jobber price. This finding was based on the manner in which the parties interpreted and performed the agreement during the first year of operation.

"For the first year of operation under the contract both parties concurred in interpreting the contract to mean that Sunray's price was arrived at from Vickers' jobber price, but that if the jobber price to any 'existing' (at the date of the contract) jobber was lower than competition, the competitive jobber price in that market would be used. If the price was under competition to a 'new account', that price would be excluded in arriving at 'average realization.'" 285 F.Supp. at 405.

Thus, under the mechanics of the formula, Vickers' price to Sun Oil would be near the competitive level regardless of the price at which Vickers sold to its jobbers. The record is replete with additional evidence to support this interpretation of the trial court.

A similar "intention of the parties" clause appears in subsection (a) of section 2, which deals with transportation charges. Vickers' average realization was not to include transportation costs from the pipeline point at which Vickers took delivery. It did not matter to Vickers where the gasoline was delivered, but the point of delivery did affect Sunray's return because of the possibility of larger transportation costs. Therefore, subsection (a) provided:

"It is the intention of the parties that overall transportation costs shall be minimized insofar as feasible, and to that end Sunray will make gasoline available at as many supply points as is possible via pipe line terminals and exchanges."

During the operation of the contract, this clause was interpreted by the parties to mean that if Vickers took delivery of gasoline at a "non-preferential point" along the pipeline, thus making the deductible transportation charges higher, Vickers was only entitled in its accounting to deduct those transportation charges which would have been incurred had it taken delivery from a preferred point. Thus, Vickers could accept delivery of gasoline at any point, but could only deduct transportation charges from a preferred point in calculating its realization.

Howard Stanley, a cost and pricing economist, had served as one of Sunray's principal negotiators in connection with the contract and was placed in charge of its administration. He testified that once the contract went into effect, Vickers did sell below the competitive level. He also said that the intention clause of section 2(d) related to accounting procedures rather than control of Vickers' resale prices. In part, he testified:

"Q. Was it your understanding of the intent clause, Mr. Stanley, that this clause required that the prices used in *computing Vickers' realization* be no

lower than the prices of Vickers' competitors?

A. Yes, this is the way I understood the contract.

\* \* \* \* \* \*

Q. Was this intent language put in, Mr. Stanley in order to insure that if Vickers installed price discounts which brought its price below competition it wouldn't be allowed to deduct those from its realization? \* \* \*

A. This is my understanding." (Emphasis added.)

Peter Affeld, who was an assistant to the president of Vickers at the time the contract was made corroborated Mr. Stanley's explanation of the intention clause. Concerning the sentence "Vickers prices \* \* \* will be no lower than the prices to branded jobbers of one or more of Vickers' principal competitors", Mr. Affeld testified:

"Q. What was the purpose of the last sentence which you read, Mr. Affeld?

A. This was language devised to be the equivalent of what had been in the earlier drafts.

\* \* \* \* \* \*

\* \* \* The purpose of this sentence, however, is only for the purpose of computing the price that Vickers would pay Sunray."

Sunray's attorneys, experienced in antitrust work, approved the contract without any question of antitrust consequences. This indicates that they understood section 2(d) to set a minimum on Vickers' price to Sunray rather than limit the price at which Vickers could resell.

Sunray's motivation in not seeking to cancel the contract until 1965 is also subject to some question. It was in 1964 that Sunray discovered the contract had not been as profitable to them as anticipated. Its own economic study indicated that it could increase its net income by as much as $2,000,000 per year over the balance of the contract period if the contract were to be cancelled. Sun-

ray's realization of this fact is evidenced in its letters to Vickers. During the first year of the contract, in those instances when Vickers sold to its jobbers at prices which Sunray's Stanley believed to be less than the prevailing competitive level, Stanley's letters to Vickers spoke of making adjustments in Vickers' average realization based on the competitive price. After Sunray learned that its net return on the contract was less than anticipated, the tenor of its correspondence with Vickers changed. The letters indicated that Vickers' sales below the competitive level constituted a material breach of the contract and demanded that Vickers raise its prices to the competitive level. This change in attitude was in part at the instruction of Sunray's general counsel who was familiar with the fact that Sunray's management was keeping a close watch for any breach of the contract by Vickers.

Our function in reviewing the trial court's finding is, of course, a limited one. We view the evidence in a light most favorable to the prevailing party, giving that party the benefit of such favorable inferences as may reasonably be drawn from the evidence, and we are bound to affirm unless the findings of the trial court are clearly erroneous. Parke-Davis & Co. v. Stronsodt, 411 F.2d 1390 (8th Cir. 1969); Burger Chef Systems, Inc. v. Govro, 407 F.2d 921 (8th Cir. 1969); Cleo Syrup Corp. v. Coca-Cola Co., 139 F.2d 416, 150 A.L.R. 1056 (8th Cir. 1943), cert. denied, 321 U.S. 781, 64 S.Ct. 638, 88 L.Ed. 1074 (1944). The trial court interpreted the disputed provision to mean that Vickers could resell the gasoline to its jobbers at any price it desired. Its price to Sunray, however, would be calculated from realization in those markets in which Vickers sold at the competitive level. We are satisfied that this interpretation was a logical and proper one under the evidence submitted.

### III.

Finally, Sunray contends that, even as interpreted by the trial court, the con-

tract embodies an arrangement to maintain and stabilize prices in violation of the Sherman Act. Sunray asserts that the disputed provision was designed to restrict, restrain, and dampen price competition.

 Stabilization of prices is within the ban of § 1 of the Sherman Act. United States v. Container Corp. of America, 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969); United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). In order to bring this contract within the ban, however, Sunray is required to demonstrate that the agreement had the effect of stabilizing prices in some degree. United States v. Container Corp. of America, *supra*. Sunray has produced no such evidence but would rely on statements made in Vickers' pre-trial pleadings to the effect that, in entering into the contract with Sunray, Vickers intended to continue its existing pricing policies. The record, however, supports the trial court's finding that the parties did not intend the disputed clause to be a price-fixing agreement and that the operation of the contract did not affect Vickers' resale prices in any manner.

As the Supreme Court stated in United States v. Socony-Vacuum Oil Co., *supra:* "Under the Sherman Act a combination formed for the *purpose and with the effect* of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal *per se.*" (Emphasis added.) 310 U.S. at 223, 60 S.Ct. at 844. It is difficult to see how the parties can be held to have entered into a price-fixing agreement in the absence of intent to fix prices or proof that the agreement actually did fix prices. See, Denison Mattress Factory v. Spring-Air Co., 308 F.2d 403 (5th Cir. 1962); United States v. Columbia Pictures Corp., 189 F.Supp. 153 (S.D.N.Y.1960).

We also note that the Supreme Court has taken a dim view of private parties seeking to avoid their contractual obligations by asserting the illegality of the

contract under the Sherman Act. The Court said in Kelly v. Kosuga, 358 U.S. 516, 519, 79 S.Ct. 429, 3 L.Ed.2d 475 (1959): "[T]he federal courts should not be quick to create a policy of nonenforcement of contracts beyond that which is clearly the requirement of the Sherman Act." Accordingly, the trial court's consideration of all the relevant evidence in interpreting the contract was proper. Its conclusion that the contract does not violate the Sherman Act is supported by substantial evidence.

Affirmed.