**MEDTRONIC, INCORPORATED,**
**Appellee,**

v.

**CATALYST RESEARCH**
**CORPORATION,**
**Appellant.**

**Nos. 81–1748, 81–1917.***

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 16, 1981.

Decided Nov. 6, 1981.

---

* Appeal No. 81–1917 is from CRC's motion to vacate or suspend the preliminary injunction and raises no issues other than those included in Appeal No. 81–1748, from the order granting the preliminary injunction.

Pennie & Edmonds, Stanton T. Lawrence, Jr., Berj A. Terzian, argued, Walter G. Marple, Jr., Rory J. Radding, New York City, Dorsey, Windhorst, Hannaford, Whitney & Hallady, Peter Dorsey, Minneapolis, Minn., for appellant Catalyst Research Corp.

Schroeder, Siegfried, Ryan, Vidas, Steffey & Arrett, P. A., Robert O. Vidas, Faegre & Benson, John D. French, Lawrence C. Brown, argued, John F. Beukema, John D. Shively, Minneapolis, Minn., for appellee Medtronic, Inc.

Before BRIGHT, HENLEY and AR-NOLD, Circuit Judges.

BRIGHT, Circuit Judge.

Catalyst Research Corporation (CRC) appeals from an order of the district court[1] granting Medtronic, Inc. (Medtronic), a preliminary injunction. The injunction prohibits CRC from instituting or prosecuting any action to enjoin Medtronic from manufacturing lithium-iodine batteries or selling pacemakers containing the batteries. The district court issued the preliminary injunction based on its conclusion that CRC's written agreement (the Agreement) with Medtronic bars CRC from interfering with Medtronic's production of lithium-iodine batteries. We affirm the grant of the preliminary injunction for reasons set forth in this opinion, and remand this case to the district court for prompt resolution of the underlying contract dispute.

I. *Background.*

This dispute[2] centers around two patents related to lithium-iodine batteries owned by CRC: United States Letters Patent No. 3,660,163 for "Solid State Lithium-Iodine Primary Battery" (the Moser Patent) and No. 3,674,562 for "Primary Cells and Iodine Containing Cathodes Therefor" (the Schneider Patent).

In 1972, CRC granted Wilson Greatbatch, Ltd. (WGL), an exclusive license under the patents to market the lithium batteries. WGL supplied the batteries to Medtronic, a leading manufacturer of cardiac pacemakers. When Medtronic realized the importance of the lithium-iodine batteries to the production of cardiac pacemakers, it took steps that would make possible its own production of the batteries. Toward this end, in March 1976, Medtronic negotiated an agreement with WGL to exchange technology and know-how.[3]

CRC objected to the proposed transfer on the ground that WGL had no right to reveal to any other party the information it had received under a license from CRC. CRC maintained that supplying Medtronic the information that would enable it to produce lithium-iodine batteries internally would necessarily disclose information related to the Moser/Schneider patents that CRC had licensed to WGL. Rather than risk legal action by CRC to enjoin the exchange, WGL indicated to Medtronic its unwillingness to proceed with the proposed exchange. By this time, Medtronic had undertaken substantial preparations for in-house production of the lithium-iodine batteries, and urgently needed the technological information from WGL. Consequently, Medtronic began direct negotiations with CRC. On June 25, 1976, Medtronic entered the Agreement with CRC under which Medtronic paid CRC $250,000 in return for CRC's promise not to impede the exchange between WGL and Medtronic. By 1977, Medtronic had begun manufacturing its own lithium-iodine batteries.

---

1. The Honorable Earl R. Larson, United States Senior District Judge for the District of Minnesota.

2. The district court's first reported opinion ruling on motions in this case, *Medtronic, Inc. v. Mine Safety Appliances Co.,* 468 F.Supp. 1132 (D.Minn.1979), contains a detailed account of the relationship of the parties and the history of this litigation. In a subsequent opinion, *Medtronic, Inc. v. Catalyst Research Corp.,* 518 F.Supp. 946 (D.Minn.1981), the court granted the preliminary injunction at issue here.

3. By this time, WGL had elected to become a nonexclusive licensee under CRC's patents, and

had itself developed and patented certain technology for use in lithium-iodine powered pacemakers. Although Medtronic had no right to sublicense or otherwise transfer information it had received from CRC, "[i]n the six years that WGL had produced batteries under its CRC license, the various rights to information and technology owned by CRC and to that owned by WGL had become extensively intertwined. At this time the parameters of ownership are difficult to discern." *Medtronic, Inc. v. Catalyst Research Corp., supra,* 518 F.Supp. at 948 n.4.

This litigation began when Medtronic sought a declaratory judgment in the United States District Court for the District of Minnesota challenging the validity of CRC's two patents on the lithium-iodine battery. CRC counterclaimed, alleging that Medtronic's production of the batteries infringed the Moser/Schneider patents. In addition, CRC filed patent infringement actions against Medtronic's Canadian and German subsidiaries for infringement of its patents in those countries.

In this phase of the dispute, Medtronic seeks to prohibit CRC from enjoining its production of lithium-iodine batteries pending a determination of the patents' validity. Medtronic contends, among other things, that the Agreement bars CRC from seeking an injunction for alleged patent infringement.

In evaluating Medtronic's right to a preliminary injunction, the district court used the analysis of *Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109 (8th Cir. 1981) (*en banc*), which prescribes:

> Whether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest. [*Id.* at 113.]

The court concluded that Medtronic would likely "succeed at trial in showing that the Agreement prevents CRC from enjoining Medtronic from manufacturing the lithium-iodine battery on the basis of the technology received from WGL." *Medtronic, Inc. v. Catalyst Research Corp., supra,* 518 F.Supp. at 953. The district court, however, indicated that the agreement does not prevent CRC from seeking damages for patent infringement. *See id.*

In addition, the court determined that Medtronic would suffer irreparable harm through loss of market share in the highly competitive pacemaker industry if CRC succeeded in interrupting its production of lithium-iodine batteries during the patent infringement action. Based on its conclusion that legal damages would compensate CRC for any harm suffered as a result of Medtronic's infringement, the court ruled that the balance of equities favors Medtronic.

> CRC does not face any loss of rights—its damage actions are not affected—and as a result, the Court believes that the balance of hardships tips in favor of Medtronic. [*Medtronic, Inc. v. Catalyst Research Corp., supra,* 518 F.Supp. at 954.]

Finally, the court noted that consideration of the public interest "does not detract in any way from the balance of equities favoring Medtronic." *Id.* at 956. Because a preliminary injunction would have only limited effect on CRC's prosecution of its actions in Canada and Germany, the court concluded that its issuance did not offend principles of comity.

The issues raised on this appeal require some analysis of the Agreement in light of the record made in the application for the preliminary injunction.

II. *The Agreement.*

CRC argues on appeal that the Agreement with Medtronic authorized only the transfer of proprietary information to CRC, but did not in any way modify its patent rights. Medtronic, on the other hand, asserts that the Agreement effected a compromise between itself and CRC, whereby CRC authorized WGL to transfer to Medtronic the information that CRC had licensed to WGL, in exchange for Medtronic's promise to drop any claim that CRC wrongfully interfered with the transfer. Medtronic contends that the Agreement permitted it to manufacture lithium-iodine batteries free from interference by CRC through legal actions.

The parties' differing interpretations depend on the following provisions of the Agreement:

> 1. CRC hereby agrees that it will not directly or indirectly seek to (a) restrain WGL from transferring any information to Medtronic, or (b) restrain or in any way prevent, try to prevent or in any way interfere with Medtronic receiving and using any and all information, includ-

ing any information whether received by WGL pursuant to the February, 1970 Agreement or otherwise, included or to be included in the Agreement between Medtronic and WGL.

2. In consideration of the payment made in paragraph 3 of this Agreement, CRC agrees to and does hereby grant to WGL and Medtronic a complete release and immunity from suit for any and all claims in law or in equity for damages, profits or any injunctive relief or relief of any kind resulting from the transfer by WGL and the receipt and use by Medtronic of the WGL technical information and patent rights relating to solid state power sources transferred to Medtronic.

\* \* \* \* \* \*

6. Nothing herein shall be construed to grant Medtronic a license in or to any patent or other information of CRC or to obligate CRC to provide Medtronic with information other than that transferred or to be transferred by WGL.

This court has previously held that "[a] contract is ambiguous if reasonably susceptible of more than one construction, and the question of whether an ambiguity exists is a matter of law for the court." *Sun Oil Co. v. Vickers Refining Co.*, 414 F.2d 383, 386 (8th Cir. 1969).

The district court determined that it could not resolve this suit solely by reference to the Agreement, because, "[o]n their face, the terms are incompatible. That the express terms of the Agreement are reasonably susceptible of more than one construction cannot \* \* \* be seriously disputed." *Medtronic, Inc. v. Catalyst Research Corp., supra,* 518 F.Supp. at 951 (footnote omitted). This court agrees that the various provisions of the Agreement are ambiguous.

■ When a contract is ambiguous or obscure, the court should interpret it in light of the surrounding facts and circumstances to ascertain the intent of the parties. *Sun Oil Co. v. Vickers Refining Co., supra,* 414 F.2d at 388. The district court properly considered evidence relating to the parties' intent in entering the Agreement and determined that Medtronic acquired neither an express nor implied patent

license from CRC under the Agreement. Nevertheless, the court decided that CRC had granted Medtronic rights of use short of a patent license, by contracting not to exercise its right to seek an injunction for infringement of its patents.

■ In construing an ambiguous agreement, courts should consider the context in which it was made, including "the acts of the parties indicating what interpretation was placed upon it by the parties themselves. Contemporaneous exposition of the contract is entitled to great, if not controlling, influence in ascertaining the intention of the parties." *Pitcairn v. American Refrigerator Transit Co.,* 101 F.2d 929, 936–37 (8th Cir.), *cert. denied,* 308 U.S. 566, 60 S.Ct. 78, 84 L.Ed. 475 (1939).

Here, extrinsic evidence indicates that in entering the Agreement CRC may not have intended to bar itself permanently from seeking equitable relief for infringement of its patents. The district court determined that CRC's intent "was undoubtedly to protect whatever rights it believed it had in the material that WGL was about to disclose to Medtronic." *Medtronic, Inc. v. Catalyst Research Corp., supra,* 518 F.Supp. at 951. Consistent with this purpose, CRC submitted to Medtronic a proposal for a patent license at the time it made the Agreement. The district court's memorandum opinion states:

Medtronic recognized at the time that there were possible infringement problems with its manufacturing plan. \* \* \* Although it is reasonable to assume that Medtronic may have believed the patents to be invalid or not included in the WGL transfer and as a result negotiated just for the purpose of avoiding the cost of later infringement litigation, it *seems more likely that both parties intended the license negotiations to be a second step in their agreement to permit Medtronic to manufacture the battery.* At least at the time the Agreement was executed, this appears to have been the parties' intent. CRC consistently intended to negotiate a license agreement. [*Id.* at 951–952 (emphasis added).]

The circumstances surrounding the execution of the Agreement and the provisions

of paragraph 6 tend to negate Medtronic's contention that it had acquired the right to manufacture lithium-iodine batteries indefinitely without obtaining a patent license from CRC. Moreover, CRC had proposed $6 million as the price of the paid-up patent license it submitted to Medtronic, which far exceeds the $250,000 Medtronic actually paid to CRC. Thus, the events surrounding the negotiation of the Agreement may indicate that Medtronic did not obtain the equivalent of a patent license when it entered the Agreement. Permitting Medtronic to continue manufacturing lithium-iodine batteries within the "safe harbor" it claims the Agreement provided, would be tantamount to granting Medtronic a license, with only the amount of "fees" to be determined in a subsequent infringement action.

This court views Medtronic's likelihood of ultimate success on the merits somewhat differently than the district court. On the basis of the record before us, we have not reached the same preliminary conclusion as the district court that the Agreement bars CRC indefinitely from seeking to enjoin infringement of its patents. The circumstances surrounding the formation of the Agreement indicate that Medtronic needed the technology from WGL to begin production of lithium-iodine batteries used in its pacemakers. The $250,000 Medtronic paid in return for CRC's promise not to interfere with the proposed exchange, the flat denial in paragraph 6 that the Agreement created a license, and the subsequent patent license negotiations between the parties, all suggest that Medtronic may achieve only limited success on its claim that CRC breached the Agreement by seeking to enjoin Medtronic's alleged infringement of the Moser/Schneider patents.

We base this evaluation upon the incomplete record before us on a motion for a preliminary injunction. The district court must make the final determination on this aspect of Medtronic's contract claim. Our differing preliminary assessment of Medtronic's likelihood of success on the merits does not require reversal.

We agree with the district court that the parties seem to have intended patent license negotiations as a second step in their agreement. The June 25, 1976, Agreement may not, by itself, have created a "safe harbor" for Medtronic's continued production of lithium-iodine batteries without regard to its infringement of CRC's patent rights.

■ Although our preliminary assessment of Medtronic's probability of success on the merits differs somewhat from the district court's, this court need not evaluate the movant's likelihood of success in precisely the same way in order to uphold the preliminary injunction. *Dataphase* requires a determination of the movant's likelihood of success at trial, but considering the other facts, "[a]t base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase Systems, Inc. v. C L Systems, Inc., supra*, 640 F.2d at 113.

■ The district court concluded that the equities in this case favor Medtronic. *Medtronic, Inc. v. Catalyst Research Corp., supra,* 518 F.Supp. at 954. This court views the evidence in a light most favorable to the prevailing party in performing its limited review of the district court's determination. *See Parke-Davis & Co. v. Stromsodt,* 411 F.2d 1390 (8th Cir. 1969); *Burger Chef Systems, Inc. v. Govro,* 407 F.2d 921 (8th Cir. 1969). Because the record in this case supports the district court's evaluation of the balance of equities, we affirm the order granting Medtronic a preliminary injunction.

■ The equities of this situation, however, may change. The balance could shift in CRC's favor if, for example, the German or Canadian courts found the Moser/Schneider patents valid. In that event, the district court might reevaluate its ruling under *Dataphase* to determine whether the award by a foreign court in any way affects the merits of the present contract action.

The record indicates that CRC agreed not to interfere with the WGL/Medtronic technology exchange, and to allow Medtronic's production of lithium-iodine batteries, at least during subsequent patent license negotiations. In the event of an impasse in such negotiations, which the parties seem to

have reached,[4] the circumstances surrounding the making of the Agreement may shed some light on the limits of Medtronic's "safe harbor" theory.

In light of this preliminary assessment of the Agreement, the parties should promptly try their contract action so the court can finally determine their respective rights. Permitting Medtronic to continue production indefinitely within the "safe harbor" of this preliminary injunction—if not the Agreement—might greatly erode whatever rights CRC retains under the Moser/Schneider patents.

Accordingly, we affirm the orders of the district court. On remand, we direct the parties to try the underlying contract action promptly. Pending final resolution of this lawsuit, the district court may reevaluate whether the preliminary injunction should continue if proceedings in foreign jurisdictions establish the validity of CRC's patents and infringement by Medtronic.

---

4. The parties carried on negotiations for a patent license for almost a year after entering the Agreement. In late spring of 1977, negotiations stalled. About that time, Medtronic, after research, expressed doubts about the validity of CRC's patents. *See Medtronic, Inc. v. Mine Safety Appliances Co., supra*, 468 F.Supp. at 1138–39.