**Clinton ST. CLAIR and Don Bills, Appellees,**

v.

**EXETER EXPLORATION COMPANY, Appellant.**

**No. 81–1301.**

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 15, 1981.

Decided Feb. 22, 1982.

Jane Fleck Romanov, argued, Fleck, Mather, Strutz & Mayer, Ltd., Bismarck, N.D., for appellees.

Christine Hogan, argued, Pearce, Anderson & Durick, Bismarck, N.D., for appellant.

Before LAY, Chief Judge, McMILLIAN, Circuit Judge, and HUNTER,[*] Senior District Judge.

McMILLIAN, Circuit Judge.

Exeter Exploration Co. (Exeter) appeals from a final judgment entered in the District Court[1] for the District of North Dakota finding that Clinton St. Clair and Don Bills[2] were entitled to royalty assignment of 1/16th of 5/8ths from the Vedquam lease pursuant to a Turnkey Agreement dated November 24, 1976.

For reversal Exeter argues that the district court erred (1) in receiving and giving effect to extrinsic evidence to vary the unambiguous terms of the June 9, 1977, Letter Agreement (Letter Agreement) which modified the Turnkey Agreement, (2) in finding the Letter Agreement's meaning contrary to the clear weight of the evidence even though extrinsic evidence was to be considered, and (3) in failing to reduce the royalty in accordance with the terms of the November 30, 1977, Conditional Letter of Acceptance to the Turnkey Agreement (Conditional Letter of Acceptance). In response St. Clair argues that the Letter Agreement did not modify the Turnkey Agreement and that the Conditional Letter of Acceptance is inapplicable to acquisitions by Exeter. For the reasons discussed below, we affirm the district court.

The underlying facts are not in dispute. St. Clair and Bills organize and promote oil and gas drilling ventures. Bills is a petroleum geologist who analyzes scientific data to form a prospect and St. Clair is a "landman" who acquires the acreage necessary to develop the prospect. They then sell the package to developers in exchange for a retained overriding royalty.[3] In 1976, Bills

---

* The Honorable Elmo B. Hunter, United States Senior District Judge for the Western District of Missouri, sitting by designation.

1. The Honorable Bruce M. Van Sickle, United States District Judge for the District of North Dakota.

2. Clinton St. Clair and Don Bills are partners who will share the royalty equally. Because the controversy involves the interpretation of contracts signed by St. Clair on his own behalf and on behalf of Bills, we will designate the appellees by St. Clair's name only.

3. The term "overriding royalty" was defined in *Meeker v. Ambassador Oil Co.*, 308 F.2d 875, 882 (10th Cir. 1962), *rev'd*, 375 U.S. 160, 84 S.Ct. 273, 11 L.Ed.2d 261 (1963), as a "fractional interest in the gross production of oil and gas under a lease, in addition to the usual royalties paid to the lessor, free of any expense for

worked up a promising area in Bottineau County, North Dakota. The area of interest encompassed about 5,760 acres and was designated the Sergis Prospect.[4]

St. Clair acquired the available unleased acreage necessary to develop the prospect for exploration and development. Additional acreage needed for the prospect was held by General American Oil Company of Texas (General American) pursuant to an oil and gas lease executed by Richard Vedquam (Vedquam lease). St. Clair entered into a farmout agreement[5] with General American, dated November 18, 1976, pursuant to which St. Clair could earn a 50 percent interest in the Vedquam lease in exchange for his commitment to drill by December 31, 1976.

Additional acreage for the prospect was also to be acquired pursuant to an Acreage Contribution Agreement between William S. Towne, Robert G. Lindsay, Paul E. Riley (Towne Option), and St. Clair. The Towne Option required a well to be drilled within ninety days after completion of a test well on the Sergis Prospect.

St. Clair sold the package one-half to Exeter and one-half to Louisiana Land and Exploration Co. (LL&E)[6] pursuant to a Turnkey Agreement[7] (Exh. 1) dated November 24, 1976. By the terms of the agreement, St. Clair was to assign the leases to Exeter and LL&E as soon as he acquired them and to drill a test well on the Vedquam acreage by December 1, 1976. In exchange St. Clair was to receive a $\frac{1}{8}$th of $\frac{8}{8}$ths overriding royalty on the Vedquam lease and a $\frac{1}{8}$th of $\frac{8}{8}$ths overriding royalty on the other leases in the prospect. All royalties were to be proportionately reduced to the interests held by Exeter and LL&E.

Paragraph 5 of the Turnkey Agreement further provided:

In the event any leasehold interest covering properties located within [Sergis Prospect] ... is acquired by St. Clair, such interest must be offered to Participants [Exeter and LL&E] at cost. St. Clair shall be entitled to a $\frac{1}{16}$th of $\frac{8}{8}$ths overriding royalty under any lease acquired by Participants whether by lease, farmout, acreage contribution or otherwise.

Paragraph 5, Turnkey Agreement (Exh. 1).

On November 30, 1976, the Turnkey Agreement was supplemented by the Conditional Letter of Acceptance providing that St. Clair's override was to be "proportionately reduced as to any lease covering less than the entire fee simple oil and gas interest, and further reduced in proportion to the interests earned under said agreement by St. Clair and subsequently assigned to [Exeter and LL&E]." Exh. 31.

St. Clair performed the initial drilling commitment on the Vedquam lease which resulted in a dry hole. General American then assigned a 50 percent interest in the Vedquam lease to St. Clair, which he in

---

exploration, drilling .... It is an interest carved out of the lessee's share of the oil and gas ordinarily called the working interest, as distinguished from the owner's reserved royalty interest."

4. The Sergis Prospect, named by St. Clair, included within its borders most of the Specklebelly Prospect, which St. Clair got from General American Oil Company, and the Thor Prospect, which St. Clair got from Towne. A prospect name is simply a convenient name that a given block of leases has received from its promoter.

5. A farmout agreement is commonly used in the oil and gas industry. Pursuant to such an agreement the owner of the leasehold assigns his lease or a portion of it to another for the purposes of drilling the tract. The assignor generally retains an overriding royalty or pro-

duction payment. The drilling of the well is a prerequisite to the assignment of the acreage to the operator. Appellees' Brief at 4 n.2, *citing* Klein & Burke, "The Farmout Agreement: Its Form and Substance," 24 Rocky Mtn. Min. L. Inst. 479 (1978).

6. Louisiana Land and Exploration Co. assigned the royalties to appellees on demand. Therefore, it is not a party to the present action.

7. A "Turnkey Agreement" to drill an oil or gas well requires the developer to complete the well so that one can turn the key to the power and take production. *Continental Oil Co. v. Jones*, 177 F.2d 508 (10th Cir. 1949), *cert. denied*, 339 U.S. 931, 70 S.Ct. 666, 94 L.Ed. 1351 (1950).

turn assigned to Exeter and LL&E, 25 percent interest each (Exhs. 2 and 3).

Bills analyzed the results of the Vedquam test drilling and recommended that Exeter and LL&E drill the Towne acreage to acquire that option. He also recommended that they drill the Vedquam lease again. Exeter and LL&E, however, decided not to drill on the Towne acreage and the option expired.

Exeter and LL&E subsequently decided that they wanted to drill the Towne acreage and requested St. Clair to negotiate a farmout. St. Clair encountered difficulties arriving at an agreement acceptable to all parties and was not able to contract on behalf of Exeter and LL&E a drilling commitment in excess of twelve months in which to earn the Towne Option.

An agreement was eventually executed on June 9, 1977, and conditionally accepted by Exeter, LL&E and St. Clair on September 27, 1977 (Exh. 32). The final Letter Agreement provides in pertinent part:

Exeter Exploration Company

. . . .

The Louisiana Land and Exploration Company

RE: Sergis Prospect

Bottineau County, North Dakota

Gentlemen:

This letter, when accepted by you will constitute our agreement with regard to your acquisition and plans for drilling the subject prospect.

Bills and St. Clair have negotiated a Farmout from William S. Towne et al. into you and have negotiated a Farmout Option Agreement from Home Petroleum Corporation into you. We have also assigned to you certain leases which we owned on the prospect.

. . . .

As consideration for the services performed by Bills and St. Clair you have agreed to assign them jointly a $\frac{1}{16}$ of $\frac{3}{8}$ overriding royalty reducible to your

working interest under all acreage earned by you under the Towne et al. agreement and the Home Petroleum Option agreement or any other leases you may acquire on the prospect by leasing, farmout or otherwise during the next 12 months. Bills and St. Clair acknowledge that they are not entitled to any cash compensation or any other compensation except the above described overriding royalty for any services performed by Bills and St. Clair in connection with the farmout negotiations, leasing or the drilling and completing of the proposed test well.

. . . .

The Skaar No. 1 well was completed on the Towne acreage as a dry well on October 10, 1977. Bills examined the data from the Skaar test well and again recommended to Exeter and LL&E that they drill another well on the Vedquam lease.

On November 20, 1978, General American advised St. Clair that it intended to let the Vedquam lease expire. St. Clair informed Exeter and LL&E and expressed his interest to Exeter to renew the lease (Exhs. 22, 23 and 40) if Exeter chose not to. Exeter did not respond.

On January 11, 1979, Exeter entered into an oil and gas lease with the widow of Richard Vedquam and acquired a 100 percent interest in the Vedquam lease. The lease covered the same lands as the original Vedquam lease (Exh. 4). The new Vedquam lease predated the expiration date of the original lease thereby constituting a top lease.[8] LL&E received an offer from Exeter to participate in the new lease. LL&E chose to participate only to the extent of a 25 percent interest.

On June 11, 1979, Exeter, LL&E and Texas American Oil Corp. (Texas American) entered into a farmout agreement for the drilling of a well on the Vedquam lease at a site previously recommended for drilling by Bills (Exh. 6). The well was a producer. Texas American then drilled the No. 2 Vedquam which was also a producer.

---

8. A "top lease" is a lease made before the prior lease has expired; therefore, the term of the new lease overlaps the term of the old lease.

When St. Clair learned of the new Vedquam lease and drilling he went to Exeter and LL&E and demanded a $\frac{1}{16}$th of $\frac{8}{8}$ths overriding royalty pursuant to Paragraph 5 of the Turnkey Agreement. LL&E complied. The Exeter landman initially offered St. Clair $\frac{1}{32}$nd of $\frac{8}{8}$ths (Exh. 5). St. Clair refused, stating that he was entitled to $\frac{1}{16}$th. Exeter then reexamined its file and refused St. Clair anything, saying that the Letter Agreement modified the Turnkey Agreement by placing a twelve-month limitation on all of St. Clair's rights in the Sergis Prospect.

St. Clair then brought an action in federal district court for specific performance of Paragraph 5 of the Turnkey Agreement, arguing that the Letter Agreement was a distinct contract limited to the Towne acreage.

At trial, over Exeter's objection that the Letter Agreement unambiguously applied to the entire Sergis Prospect, the district court received oral testimony and documentary evidence concerning the negotiations for releasing the Towne acreage and the conversations and understandings of the participants culminating in the written Letter Agreement.

The district court did not expressly pass upon the question of whether the Letter Agreement was ambiguous but found that its twelve-month limitation did not apply to the Vedquam lease. The district court stated:

So here, considering the flow of circumstances, I conclude that the general references to the Sergis Prospect in the letters of June 9 and September 22, 1977 are just that, and the letters are drawn with particular reference to that portion of the Sergis Prospect which came into the area of mutual interest as part of the Thor Prospect. This is consistent with 9–07–13 NDCC which provides:

However broad may be the terms of a contract, it extends only to those things concerning which it appears that the parties intended to contract.

And is consistent with that maxim of jurisprudence recited in 31–11–05 No. 25 NDCC which provides:

Particular expressions qualify those which are general.

I also conclude that inasmuch as the Towne and Horne Petroleum leases were tenuously held at best, and drilling was urgently demanded, it was logical to place a short time limit on the drilling of the well described in the letters of April 12 and September 27, 1977.

*St. Clair v. Exeter Exploration Co.*, No. A1–79–174 (D.N.D. Jan. 26, 1981) (slip op. at 6–7).

The district court found that Exeter's acquisition of a top lease to the original Vedquam lease was an acquisition within the terms of Paragraph 5 of the Turnkey Agreement and held that St. Clair and Bills together were entitled to a royalty assignment of $\frac{1}{16}$th of $\frac{3}{4}$ths from Exeter.

On appeal Exeter first argues that the Letter Agreement unambiguously applies to the entire Sergis Prospect and that the district court erred in considering extrinsic evidence to vary its terms. Exeter relies primarily on the fact that the heading of the Letter Agreement refers to the Sergis Prospect and also on the language in Paragraph 4 to the effect that St. Clair was entitled to a $\frac{1}{16}$th of $\frac{8}{8}$ths override "under all acreage earned by [Exeter] under the Towne et al. agreement and the Home Petroleum Option agreement or any other leases [Exeter] may acquire on the prospect ... during the next 12 months." In response St. Clair argues that the Letter Agreement expressly defines such override as "consideration for the services performed by Bills and St. Clair," describing those services as the negotiations undertaken by St. Clair on behalf of Exeter for the drilling of the Skaar well on the Towne acreage.

Alternatively, Exeter argues that even if extrinsic evidence were permissible, the evidence does not support the district court's finding that the Letter Agreement did not apply to the entire Sergis Prospect.

█ The question whether an ambiguity exists is a matter for the court. *Swanson v. Baker Industries, Inc.*, 615 F.2d 479, 485 (8th Cir. 1980); *Sun Oil Co. v. Vickers Refining Co.*, 414 F.2d 383, 386 87 (8th Cir. 1969). In *Sun Oil* we said:

In determining whether there is an ambiguity, it is proper to examine the disputed language in the context of the entire agreement. And evidence relating to prior negotiations and other circumstances surrounding the making of the contract are to be considered in determining whether the contract is ambiguous.

*Id.* at 387 (citations omitted).

■ Here, evidence of the parties' pre-contract negotiations and testimony concerning the Letter Agreement indicate that there was an ambiguity as to whether the Turnkey Agreement or the Letter Agreement governed St. Clair's right to royalties from the Vedquam lease. Testimony at trial established that subsequent to allowing the Towne Option to expire, Exeter requested St. Clair to release the acreage. As admitted by Exeter, St. Clair was not requested during the releasing negotiations to relinquish or curtail his rights to an override in acquisitions in the area of mutual interest under the Turnkey Agreement to leases obtained twelve months after the date of the Letter Agreement. In addition, St. Clair's initial attempt to release the acreage on behalf of Exeter was by a letter and plat addressed to Paul Riley, dated April 12, 1977 (Exh. 10), which referred to the venture between Exeter and LL&E to farm-in the Towne acreage and drill what was to be known as the Skaar No. 1 test well. The Vedquam lease was not included within the area outlined on the plat. Finally, testimony at trial indicated that the twelve-month limitation in the Letter Agreement stemmed from the fact that none of the options to earn acreage by drilling the Towne property would be valid beyond a twelve-month term.

In light of the prior negotiations and the context in which the Letter Agreement was contracted, we feel that it is not clear whether the Letter Agreement modifies the Turnkey Agreement or whether is it a distinct contract. The district court's implied finding that an ambiguity existed as to which contract governed was correct.

■ Once it is determined that an ambiguity exists, the contract is open to interpretation. Under North Dakota law, which controls the substantive issues in this diversity case, a contract "may be explained by reference to the circumstances under which it was made and the matter to which it relates." N.D.Cent. Code § 9–07–12. *See Metcalf v. Security International Insurance Co.,* 261 N.W.2d 795, 799 (N.D.1978). The district court found that the Letter Agreement was a distinct contract applicable to the Towne acreage. This finding was based on the characteristics of the oil industry, the Towne acreage and St. Clair's initial attempts to release the acreage.

■ Our function in reviewing the trial court's interpretation of the contract is a limited one. We view the evidence in the light most favorable to the prevailing party and are bound to affirm unless the findings of the trial court are clearly erroneous. *Sun Oil Co. v. Vickers Refining Co., supra,* 414 F.2d at 389 (cases cited therein). *See also Metcalf v. Security International Insurance Co., supra,* 261 N.W.2d at 799 ("If, however, the parties' intentions cannot be determined from the writing alone and reference must be made to extrinsic evidence, then those questions in regard to which extrinsic evidence is adduced are questions of fact to be determined by the trier-of-fact"). The district court interpreted the Letter Agreement to apply only to the Towne acreage. We are satisfied that this interpretation was a proper one under the evidence submitted.

■ Exeter next argues that the district court erred in failing to apply the proportionate reduction language in the Conditional Letter of Acceptance (Exh. 31). The relevant language provides:

... St. Clair shall assign to Participants [Exeter and LL&E] all of his right, title and interest in and to any and all Farm-out Agreements, Options ... pertaining to this prospect ... subject to and only to the reservation by St. Clair of a 1/16 of 8/8 overriding royalty interest proportionately reduced as to any lease covering less than the entire fee simple oil and gas interest ....

Exhibit 31 at 92. Exeter argues that because St. Clair had only earned a 50 percent interest in the Vedquam lease under the

General American Farmout Agreement, his overriding royalty should be reduced to $\frac{1}{32}$nd. In response St. Clair argues that the relevant language applies only when an interest earned by St. Clair and assigned to Exeter was less than a full interest lease. St. Clair argues that Exeter's acquisition of the second Vedquam lease was a new lease falling within Paragraph 5 of the Turnkey Agreement.[9] We agree with St. Clair.

The acquisition at issue in this case was an acquisition by Exeter of a 100 percent interest in the Vedquam lease. Therefore, the language relied on by Exeter is, on its face, inapplicable because that language refers only to acquisitions by St. Clair and only to acquisitions that are less than 100 percent interest.

In sum, we affirm the district court's finding that Exeter's acquisition of a top lease to the original Vedquam lease was a lease acquisition within Paragraph 5 of the Turnkey Agreement thereby entitling St. Clair to an assignment of $\frac{1}{16}$th of $\frac{8}{8}$ths overriding royalty reducible by Exeter's interest.

Accordingly, the judgment is affirmed.

---

**9.** St. Clair also argued that he would be entitled to a $\frac{1}{16}$th of $\frac{8}{8}$ths even if the second lease was characterized as an extension or renewal of the original lease because there is a fiduciary relationship between the lessee and the owner of the override. However, in view of our holding, we need not reach that argument.