**PITCAIRN et al. v. AMERICAN REFRIGERATOR TRANSIT CO. et al.**

**AMERICAN REFRIGERATOR TRANSIT CO. et al. v. PITCAIRN et al.**

**Nos. 11136, 11137.**

Circuit Court of Appeals, Eighth Circuit.

Feb. 23, 1939.

Rehearing Denied March 21, 1939.

N. S. Brown, of St. Louis, Mo. (Homer Hall, of St. Louis, Mo., on the brief), for Norman B. Pitcairn and others as receivers, etc.

J. A. C. Kennedy, of Omaha, Neb. (Yale C. Holland, G. L. DeLacy, E. J. Svoboda, and R. E. Svoboda, all of Omaha, Neb., on the brief), for interveners Manufacturers Trust Co. of New York and others.

Thomas T. Railey, of St. Louis, Mo., for American Refrigerator Transit Co. and others.

Before GARDNER, SANBORN and WOODROUGH, Circuit Judges.

GARDNER, Circuit Judge.

This was a suit in equity originally brought by the Wabash Railway Company as plaintiff, against the American Refrigerator Transit Company and the Missouri Pacific Railroad Company as defendants, seeking certain equitable relief. The parties to these appeals are successors in interest to the original parties, to whom have been added by leave of court certain interveners appearing on behalf of certain mortgage holders. The case was before this court on

the appeal of plaintiff Wabash Railway Company from an order dismissing its first amended petition. Wabash R. Co. v. American Refrigerator Transit Co., 8 Cir., 7 F.2d 335. The nature of the suit and the facts as they were then pleaded by plaintiff fully appear in the opinion of the late Judge Kenyon speaking for this court on the former appeal.

It is sought to have determined (1) the legal relationship between the refrigerator company and the owners of its capital stock, the Wabash Railway Company, and the Missouri Pacific Railroad Company, and (2) the respective proprietorships of said railway companies in the refrigerator company's surplus.

On June 1, 1881, the Missouri Pacific Railroad Company, the St. Louis, Iron Mountain and Southern Railway Company, and the Wabash Railway Company, caused the American Refrigerator Transit Company to be incorporated, with an authorized capital stock of $500,000.00, to be divided among the incorporating railway companies equally, share and share alike. The authorized capital was not paid in by the incorporators, but each furnished the refrigerator company the sum of $14,985.00 in cash for working capital, and 100 refrigerator cars. For the use of the refrigerator cars the railroad companies received a rental of $5.00 per month per car.

Concurrently with the act of incorporation, the railway companies executed two contracts under date June 1, 1881, one an operating contract providing that compensation should be paid for the use of the refrigerator company's equipment and services, and the other a contract which provided that the earnings of the refrigerator company, after its expenses were paid, should be divided among the three railroad companies "in the proportion which the business done and money earned over the roads or lines of each party shall bear to the whole earnings of said first party during the period for which such distribution is made, the several parties hereto hereby agreeing to the payment of dividends in that proportion on their stock." This is referred to as the stockholder's contract. It was agreed in this contract that the stock in the refrigerator company should be held and transferred subject to its provisions, and that all certificates of stock should contain full reference to the agreement and be expressly subject to all its provisions.

In 1894, the refrigerator company had a surplus in excess of $500,000.00, and the capital stock then held by the three railroad companies was surrendered and new stock was reissued against $500,000.00 of the surplus. The reissue of the stock to the three railroad companies was on the basis of revenues previously contributed by each respectively, as provided in the contract of June 1, 1881. After this reissue, the respective parties did not each hold the same proportion of stock, but the Missouri Pacific owned 18.6%, the Iron Mountain 57.057%, and the Wabash 24.343%, of the outstanding stock. The stock of the Iron Mountain was transferred to the Missouri Pacific in 1917.

The two contracts of June 1, 1881, were re-executed as of January 1, 1894. The operating contract provided that on all business done with the refrigerator company, the railroad should pay it on all freight carried in the cars of the refrigerator company, a commission of 12½% of the charge received by the railroad for transportation of the property over its road, and one cent per mile for each mile any car should be used on its line. Earnings of the refrigerator company were distributed to the stock-owning railroad companies in accordance with the contract until 1908. After that time no dividends or earnings were distributed, but all net revenues were used for the acquisition of additional equipment and other property by the refrigerator company. In 1902, a controversy arose as to the proper distribution of surplus among the railroads. On March 20, 1917, the refrigerator company, through action of its board of directors, which then consisted of four of the chief executive officers of the Missouri Pacific and two of the chief executive officers of the Wabash, at a special meeting attended by three Missouri Pacific directors and one Wabash director, terminated the operating contract and purported to terminate the stockholder's contract for division of earnings. The Wabash director did not vote on the question. The operating contract contained a provision that it should remain in force for ten years and that thereafter it could be terminated by a sixty-day notice by either party, but no like provision for cancellation was contained in the stockholder's contract. Written notice of attempted termination of both contracts was given the railroads by the refrigerator company. On May 21, 1917, the Wabash wrote to the refrigerator company acquiescing in the

termination of the operating contract, but denied the right of the refrigerator company to terminate the stockholder's contract. Since that time the refrigerator company has continued to carry on its business successfully and with no controversy except as to the question of the proper basis for division of its surplus among the stockholding railroads.

In 1921, the Wabash commenced this suit in equity, and in its first amended bill of complaint sought relief as follows: (1) that the refrigerator company be decreed to be the joint agency and instrumentality of the railroad companies by reason of the operating and stockholder's contracts, but decreed to be vested with an equitable lien upon the entire net income or surplus earnings of the refrigerator company, and that the investment of the net surplus earnings of the refrigerator company resulted in a trust in the property acquired for the benefit of the respective railroad companies (3) that there be an accounting of all operations of the refrigerator company during the entire period the operating and stockholder's contracts were in force; (4) that the court decree enforcement of an arbitration award made February 3, 1912, under submission of certain phases of the controversy to an arbitrator; (5) that the court decree invalid the action taken to terminate the stockholder's contract and decree specific performance thereof.

The lower court sustained a motion to dismiss the bill, but on appeal we reversed the action of the lower court. Wabash Railway Company v. American Refrigerator Transit Co., 8 Cir., 7 F.2d 335. The opinion remanding the case for further proceedings was filed July 22, 1925. The taking of testimony was not commenced until 1931.

On June 4, 1931, the Wabash again amended its bill of complaint, eliminating all allegations to the effect that the attempted termination and cancellation of the stockholder's contract should be set aside and specific performance be decreed, and prayed instead for a decree declaring the trust to exist, for an accounting of all operations of the refrigerator company from January 1, 1894 to May 19, 1917, that a trust be decreed to exist on the latter date, and for a separate accounting of the trust estate operations from May 19, 1917, to date.

From January 1, 1918, to February 28, 1920, the railroads were under Federal control. After the period of Federal control, the contributions of the Missouri Pacific to the business of the refrigerator company greatly exceeded those of the Wabash, whereas prior to Federal control those of the Wabash had approximated the contributions of the Missouri Pacific.

The case was referred to a special master, who, on February 15, 1934, filed his report, to which certain exceptions were filed. After final hearing, on January 22, 1937, the lower court filed its opinion and order, holding that the stockholder's contract was in continuous force and effect. In its final decree, the court fixed the respective rights of the railroad companies as follows: Missouri Pacific, 66.078%; Wabash, 33.922%.

From the decree both parties have appealed. The plaintiff Wabash assigns errors which present the following questions: (1) Did the stockholder's contract come to an end on May 19, 1917? (2) Did the second amended bill of complaint set up a separate and distinct cause of action from that pleaded in the original amended bill of complaint?

The defendants American Refrigerator Transit Company and the Missouri Pacific and the interveners, have taken a cross-appeal, in which they contend that the court erred in failing to include refrigerator and other revenues and revenues from subsidiaries in apportioning earnings.

The appeal of the Wabash will be first considered. Counsel for the Wabash in their brief, with commendable frankness say:

"The question whether the Stockholder's Contract of January 1, 1894, came to an end on May 19, 1917, by force of the sixty-day notice given by the Refrigerator Company as directed by a majority of its Board of Directors at their meeting held March 20, 1917, and the repudiation of its obligations thereunder by said notice, is of first importance on this appeal, for if the final judgment of this court shall be to the effect that said contract has continuously been in effect from the date thereof to the present time, and still is in effect, then this appeal must fail."

The Wabash, up to the filing of its second amended bill of complaint on June 4, 1931, consistently refused to accept or be bound by the notice of cancellation of the stockholder's contract. It contended that the refrigerator company and the Missouri

Pacific were bound to comply with its terms. In fact, the suit as disclosed by the bill of complaint, demanded specific performance of that contract. When the refrigerator company attempted to repudiate the stockholder's contract in 1917, the Wabash could doubtless (1) have treated the refusal to perform as a breach justifying an immediate action to recover its proper share of the trust estate, with such damages as it may have suffered as a result of the breach, or (2) it might have preserved the life of the contract in all respects, unaffected by the repudiation of the refrigerator company, and insisted upon its continued performance, or (3) it could, within a reasonable time, have accepted the breach or repudiation as an offer to rescind and thus the contract would have been rescinded by voluntary agreement. It could not, however, proceed on the theory that the contract was a valid subsisting one and also upon the theory that it had been rescinded because each of these remedies was inconsistent with the other. The fact that the refrigerator company repudiated the contract, and the fact that until 1931 the Wabash refused to accept that breach or repudiation as terminating it and insisted upon full performance, are both established facts. The bringing of this suit for specific performance was a recognition of the contract as existing. A court of equity may enforce the specific performance of an existing contract, but, confessedly, it can not create an obligation. Atchison, T. & S. F. R. Co. v. Denver & N. O. R. Co., 110 U.S. 667, 4 S.Ct. 185, 28 L.Ed. 291.

■ Of course, the refrigerator company could not alone set aside this contract. There were three interested parties, and there must have been the same meeting of the minds to annul or set aside the contract as was required in the first instance to make it. Wheeler v. New Brunswick & C. R. Co., 115 U.S. 29, 5 S.Ct. 1061, 29 L.Ed. 341; Chicago, B. & Q. R. Co. v. Nebraska, 170 U.S. 57, 18 S.Ct. 513, 42 L.Ed. 948.

■■ The conduct of the Wabash is inconsistent with the thought that it had acquiesced in the cancellation of the contract. It did nothing to indicate its election so to do. Hennessy v. Bacon, 137 U.S. 78, 11 S.Ct. 17, 34 L.Ed. 605. It seems clear that the contract was not terminated by the breach and attempted repudiation in 1917 because the Wabash was insisting upon performance and was refusing to accept the repudiation as terminating the contract.

But it is argued that the Wabash, when it filed its amended pleading, June 4, 1931, accepted the offer to rescind made by the refrigerator company in 1917, and that it acquiesced in and adopted the act of repudiation. This, we think, it was precluded from doing for several reasons. In its original bill of complaint, the Wabash not only asserted the existence and validity of this stockholder's contract, but by its suit sought its specific enforcement. There was no claim of rescission, but the · Wabash elected to stand on the contract and invoke the aid of a court of equity for its specific enforcement. These facts would ordinarily constitute an election. Issenhuth v. Kirkpatrick, 8 Cir., 258 F. 293; McDonald v. Kansas City Bolt & Nut Co., 10 Cir., 149 F. 360, 8 L.R.A.,N.S., 1110; First Nat. Bank of Kansas City v. Seldomridge, 8 Cir., 271 F. 561; United States v. Oregon Lumber Co., 260 U.S. 290, 43 S.Ct. 100, 67 L.Ed. 261; Robb v. Vos, 155 U.S. 13, 15 S.Ct. 4, 39 L.Ed. 52; Belding v. Whittington, 154 Ark. 561, 243 S.W. 808, 26 A.L.R. 107; Rothschild v. Title Guarantee & Trust Co., 204 N.Y. 458, 97 N.E. 879, 41 L.R.A., N.S., 740.

In Issenhuth v. Kirkpatrick, supra, plaintiff brought suit for damages for fraud and deceit. He then amended his pleadings over objection and sought a cancellation of the contract involved. This court said:

"He had a choice between two remedies —either to rescind the purchase and recover what he had paid, or to affirm the contract and to sue for the damages he had sustained. The remedies were inconsistent, and an election of one was an abandonment of the other." [258 F. 295.]

In that case, as in this, the plaintiff by amendment sought to change the position he had taken when he brought the action and to seek a different but inconsistent remedy.

In Robb v. Vos, supra, the Supreme Court quoted with approval from Thompson v. Howard, 31 Mich. 309, as follows:

" 'A party may not take contradictory positions; and where he has a right to choose one of two modes of redress, and the two are so inconsistent that the assertion of one involves the negation or repudiation of the other, his deliberate and settled choice of one, with knowledge or means of knowledge of such facts as would authorize a resort to each, will preclude

him thereafter from going back and electing again.' " [155 U.S. 13, 15 S.Ct. 13.]

Here, the Wabash knew all the facts, and with that knowledge it not only elected to bring suit upon the contract, but it delayed fourteen years before attempting to change its election, during which time business was conducted between the refrigerator company and the railroad companies as it had been conducted before the alleged rescission and during which time the Wabash had its officers on the board of directors of the refrigerator company, and its stock was voted for the election of such directors. The officers of the Wabash voted with other directors for the repeated purchase of refrigerator cars out of surplus revenues, and joined in the approval of written representations that the refrigerator company was the owner of such cars. The president of the Wabash attended the board meetings of the refrigerator company and as a director voted for the purchase by the refrigerator company of cars aggregating over $13,000,000.00 in cost. There was not only the bringing of suit for specific performance, but there were other facts and circumstances which we think required the Wabash to stand by its election. As already observed, it had delayed fourteen years after commencing its suit before attempting to declare the contract rescinded or accept the offer of rescission. The acts and conduct of the Wabash were all inconsistent with the thought that it was acquiescing in the cancellation of this contract, or that it would do so. It acted promptly, and not only refused to acquiesce in the rescission of the contract, but brought suit for its enforcement. Between the time of the commencement of the suit and the filing of its amended bill, the position of the parties had materially changed. The refrigerator's gross assets increased approximately $24,000,000.00, and the Missouri Pacific contributed 75% of the business creating such increased assets. This it might not have done had the Wabash promptly accepted the attempted termination of the contract.

■ But if it could be said, notwithstanding the changed conditions of the parties, the long delay of the plaintiff in asserting its acceptance, and its commencement of suit specifically to enforce the contract, that this offer was still open for acceptance, the acceptance of it in 1931 would not relate back to 1917, the time when the breach or alleged termination first occurred. The doctrine of relation back is sometimes invoked by courts of equity for the purpose of doing justice, but it is a fiction which can not be applied where the demands of justice do not imperatively require its application. From 1917 to 1931, as already forecast, the Wabash had consistently maintained an attitude insisting upon performance. That position was inconsistent with the theory that it accepted such breach as terminating the contract. In 1931, it about-faced and sought to reverse this position. It would be contrary to the plain uncontradicted facts to say that the act of 1931 related back to 1917. Williston on Contracts, Sec. 96. Where the interests of third persons are involved, the fiction will never be adopted. The acts of the Wabash here would in any event definitely estop it to ask for or assert the application of such doctrine.

■ The stockholder's contract provides for a division of the profits according to the amount of business done over the respective lines. The master found, and the lower court approved and accepted the finding, that the interest of the Wabash in the property, on May 19, 1917, applying the terms of division as provided by the contract, was 53.45712725%, and that the interest of the Missouri Pacific was 46.54287275%. Applying the same measure to the property as of December 31, 1936, the respective interests were fixed by the court as follows: Wabash, 33.922%; Missouri Pacific, 66.078%. It thus appears that the contributions of the Missouri Pacific to the business of the refrigerator company, after 1917, were far in excess of those of the Wabash. Between 1917 and 1931, as before noted, there was a very large increase in the assets of the refrigerator company. The Missouri Pacific contributed approximately 75% of the business creating the increased wealth of the refrigerator company. Under these facts, the doctrine of equitable estoppel should be applied. But the Wabash contends that the Missouri Pacific, from 1917 until the 1931 amendment, took the position that the contract was at an end. The record does not, we think, sustain this contention. The first answer of the Missouri Pacific, filed February 27, 1926, contained nothing indicating that it took such a position. Neither was there anything in the answer of the Missouri Pacific to the second amended complaint filed in 1931, in the nature of an allegation that the contract came to an end in 1917. In fact, it is alleged that the Wabash was

estopped to take such position because of the position taken in its original pleadings.

 At the trial, the defendant refrigerator company and the defendant Missouri Pacific appeared by the same counsel, and certain portions of the objections of this counsel to evidence are urged by the Wabash as indicating that the Missouri Pacific adopted and acquiesced in the position that the contract was terminated in 1917. As to these objections, it seems enough to say that they do not indicate that such position was taken as to the stockholder's contract. It is pointed out by the Wabash that at the conclusion of all the evidence, a motion was made by each defendant severally to dismiss the cause upon many grounds, among others that upon the undisputed evidence in the case, plaintiff was not entitled to an accounting upon the contract "which the evidence shows was cancelled May 1, 1917, or fourteen years before the date of the filing of the second amended petition." It is observed that this occurred at the conclusion of the taking of all the evidence. Manifestly, this action has in it no element of estoppel. It did not mislead the Wabash into any action taken, as the motion was made long after the acts which fixed the rights of the parties had taken place. It was not the admission of a fact by pleading or stipulation, but rather a legal conclusion based on the record made, and the admission of a legal conclusion is not binding on either the trial or appellate court, nor on the party by whom made. People v. Pittsburg R. Co., 244 Ill. 166, 91 N.E. 48; Bradway v. Miller, 200 Mich. 648, 167 N.W. 15; Rousseau v. Brotherhood of American Yeomen, Mich., 139 N.W. 2; Auburn City Club v. McGeer, 198 N.Y. 160, 91 N.E. 539. The admission is claimed to arise from the use of the words "from the contract set out in the second amended petition, which the evidence shows was cancelled May 1, 1917." These words may well have been intended to apply to the operating contract which was in fact cancelled. It is at least extremely doubtful that they could apply to the stockholder's contract which this court had already determined had not been cancelled in 1917 and which the evidence shows was not cancelled at any subsequent time.

On this phase of the case, we conclude that the Wabash, by its delay in accepting or acquiescing in a rescission of the contract, and by its commencement of suit to specifically enforce the contract, considered in connection with the change of the interests of the parties in the interim, should be held to its election, and that it can not now be heard to assert that the contract was rescinded in 1917; that if it could be said that it was still open to the Wabash to accept or acquiesce in the rescission in 1931, when it filed its second amended bill, such rescission could not, under the doctrine of relation back, be made effective as of May 19, 1917. We are also of the view that the Wabash did not effect a termination of the stockholder's contract by the amendment of its pleading in 1931. The facts with reference to the attempted rescission of this contract were all presented to the master and to the court and their conclusion is not based upon the pleadings, but on the facts. There is nothing in the record justifying the conclusion that the parties ever agreed that this contract should be rescinded.

 There remains for consideration the errors assigned on the cross-appeal. The lower court in determining the respective interests of the railroads in the trust estate, excluded the so-called refrigerator revenues and revenues arising from subsidiaries. Whether the court was correct in so doing depends upon the interpretation to be given the stockholder's contract. Clause 2 of this contract as rewritten in 1894, provides as follows:

"2. Whatever surplus accruing from all sources shall remain after payment of the expenses and rentals above mentioned, shall be distributed among the three parties hereto of the second part, upon percentages arrived at by taking the revenue derived from the business done over the roads or lines of each party of the second part as a basis, applying same to the whole surplus of the said party of the first part during the period for which such distribution is made, the several parties hereto hereby agreeing to the payment of dividends in that proportion on their stock."

The revenues accruing to the refrigerator company may be classified as follows: (1) mileage; (2) commissions; (3) refrigerator and other revenues. The mileage payments are the per mile payments agreed to be paid to the refrigerator company as refrigerator cars move over the respective lines of the railroads. Commissions referred to are 12½% of freight tariffs charged by the railroads to their customers for transportation of merchan-

dise in cars of the refrigerator company. The payment of these commissions was abrogated March 30, 1917. Refrigerator revenues were for services aside from the transportation of merchandise in the refrigerator cars and included icing, reicing, inspection of cars, and liability for losses occasioned other than by the negligence of the railroads. Other revenues included heater service, ventilator service, and shippers' icing service.

Up to 1930, the contribution of the Missouri Pacific from the excluded business aggregated $4,361,034.02, and the contribution of the Wabash of similar business was only $222,121.04. The inclusion of such revenues in the basic figures of proprietary interests would therefore increase the percentage of ownership of the Missouri Pacific and would correspondingly decrease the interest of the Wabash. When the stockholder's contract of June 1, 1881, was entered into, refrigerator charges were unknown. They first came into existence in 1891. When such charges were first made by the refrigerator company and collected by the Wabash and the Missouri Pacific, they were collected and turned over to the refrigerator company under paragraph 13 of the operating contract as rewritten January 1, 1894, under which the railroad companies agreed as follows:

"The parties of the second part (Railroad Companies), and each of them, hereby agree to take charge of the collection of all back charges due the party of the first part (Refrigerator Company); also to place upon their bills, and collect and pay over to the party of the first part, all extra charges that may be due said party of the first part from the shipper for ice and hay, or for special lease of cars, except in case of refusal of consignee to receive the property, in which case, if loss ensues to the parties to this agreement, it shall be borne by them jointly upon the basis of revenue charged, except where the loss is due to the fault of said first party, in which case the entire loss shall be chargeable to said first party."

The contract of 1881 had substantially the same provisions.

In 1891, refrigerator charges amounted to $5,434.55. In 1894, as heretofore noted, the parties to the stockholder's agreement capitalized accumulated earnings then amounting to $503,790.46, through a redistribution and full payment of the capital stock of the refrigerator company. In making this redistribution, no account was taken of the refrigerator revenues and other charges. During the years 1894 to 1908, inclusive, the sum of $1,178,100.79 was distributed to the parties to the stockholder's contract. The percentage bases arrived at annually excluded refrigeration revenues and other charges. The refrigerator company is not a common carrier of property. The correct solution of this question would seem to depend upon the intention of the parties as that may be gathered from the language of their agreement. The basis for dividing the surplus earnings is made to depend upon "the business done over the roads or lines of each party of the second part". What is the meaning of the phrase, "the business done over the roads or lines of each party of the second part?" What constituted "business done?" Did the parties to this contract have in mind the revenues of the refrigerator company, or the revenues of the railroads? If the former, what revenues were to be counted as coming from "business done" over the lines or roads of each of the railroad companies?

Under the operating contract, executed concurrently with the stockholder's contract, each railroad was obligated to pay the refrigerator company one cent per mile for the movement of refrigerator cars over its lines, and $12\frac{1}{2}\%$ of its freight revenues earned on shipment moved in such cars. The movement of these cars constituted the business done so far as the railroad company was concerned. It appears from the evidence that from the beginning, the refrigerator company developed a separate and independent business in the furnishing to shippers of special services and facilities for which it made charges. The railroad companies performed only a transportation service and had nothing to do with the making of the refrigerator charges. As to such charges, the only obligation of the railroad companies was to make collections for the refrigerator company. The refrigeration business continued to be separate and independent even after the Interstate Commerce Act was amended to include refrigeration as a transportation service.

Of course, if this contract is clear, certain and definite, its terms must be accepted without reference to any rules of interpretation. Courts have no right to make a contract for the parties that is different from that actually entered into by them. But on the other hand, if the con-

tract is ambiguous or obscure, it is open to interpretation. Generally speaking, the cardinal rule of interpretation is to ascertain, if possible, from the instrument itself the intention of the parties, and to give effect to that intention. Where there is obscurity or ambiguity, however, the language used should be read in the light of all the surrounding facts and circumstances, including the acts of the parties indicating what interpretation was placed upon it by the parties themselves. Contemporaneous exposition of the contract is entitled to great, if not controlling, influence in ascertaining the intention of the parties. Old Colony Trust Co. v. Omaha, 230 U.S. 100, 33 S.Ct. 967, 57 L.Ed. 1410; Topliff v. Topliff, 122 U.S. 121, 7 S.Ct. 1057, 30 L.Ed. 1110; Brooklyn L. Insurance Company v. Dutcher, 95 U.S. 269, 24 L.Ed. 410; Sternberg v. Drainage District, 8 Cir., 44 F.2d 560; Powell v. Baker Ice Machine Co., 8 Cir., 8 F.2d 125; Wabash Railway Co. v. American Refrigerator Transit Co., 8 Cir., 7 F.2d 335. It is a significant fact that when the contracts were rewritten in 1894, after refrigeration services had become a recognized part of the refrigerator transportation service, no substantial change was made in the language of the contract of 1881 for division of surplus. It is to be noted too, that the parties continued until 1908 to distribute earnings on a basis which excluded these revenues. The master and the trial court, we think, correctly interpreted the contract in this respect.

■■ As to earnings on the lines of subsidiaries, the question is limited to the period following 1924. About that time the Missouri Pacific acquired a stock-controlled interest in certain railroad companies operating in southern Texas and Louisiana. With many of these subsidiaries, the refrigerator company had its separate and distinct contracts. Each of the subsidiaries operated separately and independently of the Missouri Pacific, with its own staff of officers and board of directors. The Gulf Coast Lines, consisting of several railroad companies, had no contract with the refrigerator company and paid over none of its refrigerator revenues to that company. The Gulf Coast Lines owned all of the stock in the International and Great Northern and the Missouri Pacific owned the controlling stock interest in the Gulf Coast Lines. The cross-appellants contend that the International and Great Northern and the Gulf Coast Lines should be regarded as subsidiaries of the Missouri Pacific. The Texas and Pacific Railroad had a contract with the refrigerator company. 65% of its stock is owned by the Missouri Pacific, yet the Texas and Pacific is not regarded as a subsidiary of the Missouri Pacific for the purposes of this contention by the cross-appellants. In support of their contention that the revenue of subsidiaries should be included in determining percentages, cross-appellants rely upon paragraph 17 of the operating contract of 1894, which reads as follows:

"This contract is intended by the parties to it to include, and it shall be construed so as to include, not only such lines of railroad as are now or may be hereafter owned, controlled and operated by, the several parties of the second part, but also such lines of railroad on which said parties of the second part, or either of them, now have, or may hereafter have or acquire, the right to run their own cars and trains, where the contract or arrangement with connecting lines does not prohibit or exclude the use of such refrigerator cars."

The contract is limited to lines of railroad owned, controlled and operated. These subsidiaries were not owned, controlled and operated by the railroad companies. True, "and" is sometimes read as "or," when necessary to effectuate an apparent intent. Rice v. United States, 8 Cir., 53 F. 910; Atlantic Terra Cotta Co. v. Masons' Supply Co., 6 Cir., 180 F. 332. But here again, the practical interpretation of the contract by the parties to it, clearly shows that the word "and" should not be construed as "or."

We are of the view that the court was correct in excluding the revenues from subsidiaries.

The decree appealed from is therefore affirmed.