**ASSOCIATED PRODUCERS COMPANY, Plaintiff,**

v.

**CITY OF INDEPENDENCE, MISSOURI, Defendant.**

**No. 86–1186–CV–W–9.**

United States District Court, W.D. Missouri, W.D.

Nov. 14, 1986.

---

George P. Coughlin, Gage & Tucker, Kansas City, Mo., James D. Tack, Jr., McAfee & Taft, Oklahoma City, Okl., for plaintiff.

George E. Kapke, Kansas City, Mo., and Charles Dribben, Independence, Mo., for defendant.

## ORDER GRANTING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

BARTLETT, District Judge.

On October 27, 1986, plaintiff Associated Producers Company filed a three count complaint against defendant City of Independence, Missouri ("the City"). In Count I, plaintiff, a coal supplier, seeks specific performance of a Coal Supply Contract ("the Contract") entered into between plaintiff and the City on September 9, 1980. At the same time the complaint was filed, plaintiff moved for a preliminary injunction "directing the defendant City of Independence, Missouri ... to abide by the parties' coal contract by accepting and paying for coal thereunder, pending the outcome of this litigation[.]"

On November 3, 1986, an evidentiary hearing was held on plaintiff's request for a preliminary injunction. The City does not dispute that this Court has jurisdiction of this case.

### The Contract

By the terms of the Contract, plaintiff agreed to sell and deliver and the City agreed to buy coal for its Blue Valley Power & Light Plant and its Missouri City Plant "for a period of one (1) year ... beginning on the 1st day of July, 1980, and ending on the 30th day of June 1981, and from year to year thereafter until the 30th day of June 1994, subject, however, to the provisions contained in paragraph 3 hereof with reference to price adjustments and cancellation of this contract." Paragraph 1. Plaintiff agreed to "dedicate and set aside for this contract such quality and quantity of such coal from such sources as are required for full performance of Supplier's obligations hereunder[.] ..." [1] Paragraph 1.A. The price per ton of the coal sold and delivered during the first fiscal

---

1. All references in the Contract to "Supplier" are   to plaintiff.

year, 1980–81, was set forth in the Contract. *See* Paragraph 2(a). These prices "are subject to adjustment for the second fiscal year and each and every successive fiscal year thereafter as herein provided." Paragraph 3. The prices set for the first year "shall be the basis used for increasing or decreasing the cost of supplying coal under this contract." Paragraph 3(a). "Cost of supplying coal" is defined in terms of five items of expense. *See* Paragraph 3(b). Additionally, "[i]t is expressly understood that changes in market price of coal are not changes in costs within the meaning of this paragraph and no adjustment shall be allowed therefor." Paragraph 3(b).

When the parties entered into the Contract, they expected the cost of energy to increase possibly dramatically in the period from 1980 to 1995. For its part, the City sought to obtain a guaranteed source of coal for that fifteen year period at prices that would be insulated from the expected increase in the market price of coal. The only adjustment in price permitted was as a result of increases or decreases in the cost of producing the coal purchased by the City. Plaintiff on the other hand obtained a guaranteed market for a substantial quantity of coal at a price that would fairly represent the cost of mining and delivering the coal. A guaranteed long term market for coal permitted the mines that would produce this coal to engage in long term planning that otherwise was difficult.

Since 1985, the cost of natural gas and oil has dropped substantially. As a result of competition from these alternative energy sources, the price of coal has dropped and the market for coal has contracted. The City now believes that it can purchase coal on the open market for fiscal year 1986–87 for less than the price proposed by plaintiff.

For fiscal years 1981–82, through 1985–86, the parties agreed upon adjusted prices for the coal plaintiff supplied under the Contract. In 1984 and 1985, City officials complained to plaintiff about the cost information furnished by the mines in support of plaintiff's requested price adjustments for fiscal years 1984–85 and 1985–86. Nevertheless, agreement was reached on an adjusted price for each of those years.

By letter dated July 2, 1986, plaintiff furnished the City "the price adjustment figures for the 'coal supply year' beginning October 1, 1986" (fiscal year 1986–87) assuming that the City purchased the minimum tonnage provided "in Schedule A of the contract." For each cost category, plaintiff stated the claimed increase or decrease as compared to the cost figures developed by the City's accounting department for the 1985–86 fiscal year. After extensive negotiations in July and August over proposed amendments to the Contract, plaintiff wrote the City on August 12, 1986, amending the cost figures based on the amendments plaintiff thought had been agreed to by the City's staff although not "ratified by the City Council of Independence." As its starting point, plaintiff agreed to use figures for 1985 "generated by the auditing team of the City" because "they are the last audited figures available and they were done by an auditing team from the City." Plaintiff then proposed to decrease these 1985 figures by 3.2% using the table "Bituminous Coal and Lignite—Midwest Contract" from the Producers Price Index. On the next day, August 13, 1986, plaintiff again wrote the City offering "to accept last year's audit figures reduced by the suggested Producer's Price Index figure, a decrease of 3.2%."

Thereafter, plaintiff, City officials and some members of the City Council held various meetings primarily discussing amendments to the Contract. On August 25, 1986, the City Council enacted Resolution No. 2691 cancelling the Contract because "the City Council has determined that the Supplier has not met its burden, required by the said contract, to establish the cost of Supplier's coal to be supplied to the City for the next one year period beginning October 1, 1986." Plaintiff was notified of the City Council's cancellation of the Contract by letter dated August 27, 1986.

Also on August 25, 1986, the City Council authorized the City Manager in Resolution No. 2692 to enter into negotiations with plaintiff for the execution of an "amended coal supply contract" for the next "one year period beginning October 1, 1986." Plaintiff was notified of Resolution No. 2692 in a letter from the City Manager dated August 28, 1986.

After further negotiations between the parties about the proposed amendments to the Contract, the City Manager wrote plaintiff on September 22, 1986, stating that if plaintiff signed proposed Amendment No. 3 modifying portions of the Contract by October 1, 1986, the City Council would pass an ordinance approving the Amendment and repealing Resolution No. 2691 which had cancelled the Contract. Plaintiff signed the proposed Amendment prior to October 1, 1986, but the City Council did not pass the ordinance. Thus, Resolution No. 2691 cancelling the Contract was never rescinded.

On October 17, 1986, the City requested by October 20, 1986, quotations for a maximum of 73,000 tons of coal (less than a three months supply) "per the attached Coal Purchase Specifications." Various quotations were received. The City intends to accept one of the bids unless an injunction enjoining it is issued.

### Standard for Determining Whether to Grant a Request for Preliminary Injunctive Relief.

In *Dataphase Systems, Inc. v. C.L. Systems, Inc.*, 640 F.2d 109, 113 (8th Cir.1981), the Court set forth the list of considerations to be applied by district courts in considering requests for preliminary injunctive relief:

Whether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest.

### Threat of Irreparable Harm

Plaintiff's president testified that plaintiff is a coal broker that provides assistance to various Midwestern coal mines in selling their output; that over the past few years falling prices for oil and natural gas have adversely effected the demand for coal; that during this period, plaintiff has become increasingly dependent on the long term coal Contract with the City; that as of the date of the hearing, the Contract provided approximately 90%–95% of plaintiff's revenues; that plaintiff can probably find other markets for the coal that would be supplied under the Contract but that to do so would take time; and, that if an injunction prohibiting the City from terminating the Contract is not issued, plaintiff will go into bankruptcy before it can find new markets for the coal that would have been delivered under the Contract.

■ Under some circumstances, loss of business threatening the very existence of an enterprise constitutes irreparable injury sufficient to justify the issuance of a preliminary injunction. In *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932, 95 S.Ct. 2561, 2568, 45 L.Ed.2d 648 (1975), the Court concluded that the district court had not abused its discretion in granting preliminary injunctive relief:

As required to support such relief, these respondents alleged (and petitioner did not deny) that absent preliminary relief they would suffer a substantial loss of business and perhaps even bankruptcy. Certainly the latter type of injury sufficiently meets the standards for granting interim relief, for otherwise a favorable final judgment might well be useless.

In *Semmes Motors, Inc. v. Ford Motor Company*, 429 F.2d 1197 (2d Cir.1970), the Court reviewed a temporary injunction issued to restrain the termination of an automobile dealership. On the question of whether the district court properly found irreparable injury, the Court stated:

Ford's contention that Semmes failed to show irreparable injury from termination

is wholly unpersuasive. Of course, Semmes' past profits would afford a basis for calculating damages for wrongful termination, and no one doubts Ford's ability to respond. But the right to continue a business in which William Semmes had engaged for twenty years and into which his son had recently entered is not measurable entirely in monetary terms; the Semmes want to sell automobiles, not to live on the income from a damages award. *See Madsen v. Chrysler Corp.*, 261 F.Supp. 488, 507 (N.D.Ill.1966), *vacated as moot*, 375 F.2d 773 (7 Cir.1967). Moreover, they want to continue living. As Judge Goodrich said, a "judgment for damages acquired years after his franchise has been taken away and his business obliterated is small consolation to one who, as here, has had a Ford franchise" for many years, *Bateman v. Ford Motor Co.*, 302 F.2d 63, 66 (3 Cir.1962).

*Id.* at 1205.

In *ABA Distributors, Inc. v. Adolph Coors Co.*, 661 F.2d 712, 714 (8th Cir.1981), the Court stated that:

> It was the key to the decision in *Semmes* that the terminated dealership was the product of long entrepreneurial stewardship that the plaintiffs wished to continue.

> .    .    .    .    .

> Thus, the true injury of the *Semmes* type is improper deprivation of an inveterate enterprise that, but for the defendant's challenged action, could be expected to continue.

Here, the contractual relationship between the parties was for a fifteen year period. Plaintiff had a legitimate expectation that if it complied with the terms of the Contract, the City would purchase coal from plaintiff for that period. The City concedes that it would be difficult for plaintiff to survive the cancellation of the Contract. As required by *ABA Distributors'* interpretation of *Semmes*, plaintiff is an established enterprise with a legitimate expectation of a continuing contractual relationship with the City that will be de-

stroyed if the City is not enjoined from cancelling the Contract. Money damages awarded after plaintiff is in bankruptcy will not fully compensate for the loss of plaintiff's business. *ABA Distributors*, 661 F.2d at 714; *Semmes*, 429 F.2d at 1205.

The City argues that market factors in the coal industry rather than the City's cancellation of the Contract is the cause of the threat to plaintiff's existence. The City relies on the testimony of plaintiff's president that in the last ten years, the amount of coal brokered by plaintiff has decreased from one million tons per year to approximately 300,000 tons per year, consisting almost entirely of the coal sold to the City under the Contract.

There must be a causal connection between the City's cancellation of the Contract and the harm plaintiff asserts will befall it if a preliminary injunction is not granted enjoining the cancellation. For the purposes of this motion, plaintiff has established that unless the City is enjoined from cancelling the Contract, plaintiff will not survive as a viable business. The fatal flaw in the City's causation argument is that, even though the market for coal has contracted in recent years and plaintiff has become increasingly dependent on its Contract with the City, there is no evidence that plaintiff's continued existence would be threatened if the City continued to purchase coal under the Contract. In other words, based on the evidence presented, plaintiff would continue as a viable business but for the threatened cancellation of the Contract.

*State of the Balance Between the Threatened Harm to Plaintiff and the Injury Granting the Injunction Will Inflict on the City.*

Although the City did not argue directly the harm it would suffer if the injunction is granted, a three months supply of coal for the City's two power plants can be purchased now at a lower price per ton than the City would have to pay for the same quantity of coal under the Contract. The two lowest bids received by the City in

response to its request for quotations were $27.22/ton [2] and $35.68/ton FOB the City's two power plants. The latest adjusted prices proposed by plaintiff in its letter of August 13, 1986, for the 1986–87 fiscal year were $39.66 FOB Blue Valley Plant and $40.67 FOB Missouri City Plant. Therefore, if the prices submitted for delivering coal to the Missouri City Plant are used for the comparison, the City would save approximately $981,850 under the low bid and approximately $364,270 under the second lowest bid on a purchase of 73,000 tons of coal, the amount of coal requested by the City in the Coal Purchase Specifications.

However, these savings are outweighed substantially by the severity of the threatened harm to plaintiff if the injunction is not granted. As discussed previously, plaintiff will be out of business if the City's cancellation is not enjoined. If plaintiff is in bankruptcy, plaintiff might well be without the financial resources to pursue a claim for damages against the City. *See Rittmiller v. Blex Oil, Inc.*, 624 F.2d 857, 861 (8th Cir.1980). Moreover, even if plaintiff obtained a judgment for damages at a later date, it could be too late to resurrect plaintiff as a viable business enterprise.

### *The Probability That Plaintiff Will Succeed on the Merits*

The procedure for adjusting the price of coal delivered under the Contract is set forth in subparagraphs (c) and (d) of paragraph 3:

(c) The Supplier shall notify City at least ninety (90) days prior to the expiration of the first fiscal year hereof and each successive fiscal year thereafter of any proposed price adjustments. Notice shall be in written form and shall contain a verified statement as to the basis for the changes and the source thereof. The verified statement shall show in detail the actual increase or decrease affecting such change in the Supplier's cost of supplying coal. The Supplier shall make available to the City such of Supplier's books and records as City may deem necessary to check and verify any such price adjustment. Supplier shall have the burden of establishing the cost of Supplier's coal for each fiscal year. All price adjustments shall be based solely on data and costs applicable to the mine or mines which are the source for coal sold and delivered to City.

(d) City shall, by action of the City Council, within thirty (30) days prior to the expiration of the first fiscal year thereof or the applicable successive fiscal year of operation of this contract, either approve such price adjustments and extend the term of this contract for the next ensuing year or cancel this contract as of the expiration of the current fiscal year of operation of the contract.

After the first year under the Contract and through the 1985–86 coal supply year, plaintiff's price adjustment requests were processed by the following procedure: plaintiff would submit a letter setting forth the proposed price for the next coal supply year; the City would then send an auditing team to the trucking company providing transportation of the coal from the mine to the City and to the mines producing the coal; the auditing team would review the books and records to determine whether the cost adjustments requested were supported by the information contained in them; after the auditing team reported its findings to the City, plaintiff and City representatives would discuss the City's concerns with the supporting cost information, discuss any disagreements, and arrive at an agreed upon price per ton for the coal for the upcoming coal supply year; finally, the agreed upon figures would be presented to and approved by the City Council.

To the extent the provisions of the Contract are silent about the procedure for determining whether a cost adjustment is appropriate and what the amount should

---

**2.** The bidder has advised that there was a typographical error on this bid but the bid has not been withdrawn.

be, the procedure described above established "a common basis of understanding for interpreting ..." the Contract. This procedure for determining the amount of any cost adjustment under the Contract was consistent with paragraphs 3(c) and (d) of the Contract. Therefore, based on the evidence presented, this procedure was "a course of dealing" that gave "particular meaning to" and supplemented or qualified the terms of the Contract. § 400.1–205 R.S.Mo.

For the fiscal year 1986–87, plaintiff, as it had done in previous years, wrote the City on July 2, 1986, providing "price adjustment figures for the 'coal supply year' beginning October 1, 1986." Then, in letters dated August 12, 1986, and August 13, 1986, plaintiff submitted revised cost adjustment figures based on plaintiff's understanding that an agreement had been reached with the City on Amendment No. 3. The books and records of the mines providing the coal and of the trucking company delivering the coal were available for inspection by the City.

However, the City did not send an audit team to review the books and records of either the mine or the trucking company, as it had done in previous years when the parties had agreed on price adjustments. Instead, because the City had been dissatisfied with the cost records of the mines in 1984 and 1985, the City demanded that plaintiff furnish audited cost figures in 1986. Because paragraph 3(c) only requires plaintiff to make books and records available to the City if the City deems it "necessary to check and verify any such price adjustment ..." and because the City had sent an audit team in previous years to review the cost records, a serious question arises whether the City was justified in unilaterally changing the Contract as supplemented by the course of dealings. Consequently, the City's reliance on plaintiff's alleged failure to furnish audited figures in terminating the Contract is suspect.

Furthermore, even if it is assumed, as the City asserts, that plaintiff failed to carry its "burden of establishing the cost of supplier's coal ..." for the 1986–87 fiscal year, the City failed to give plaintiff thirty days notice before termination as required by paragraph 13(a) of the Contract.

Paragraph 13(a) provides as follows:

City may, by written notice of default to the Supplier, terminate the whole or any part of this contract if the Supplier fails to make delivery of coal within the time and as specified as to quality or if the Supplier fails to perform any of the other provisions of this contract and in either of these circumstances Supplier does not correct such failure within a period of thirty (30) days (or such longer period as City may authorize in writing) after receipt of notice from the City specifying such failure or default.

Plaintiff's obligation to establish the cost of its coal for each fiscal year is an express provision of paragraph 3(c). Therefore, the City was required to give plaintiff thirty days to correct any deficiencies "after receipt of notice from the City specifying such failure or default."

The City contends that its right to "cancel" the Contract under paragraph 13(d) is different from the City's right to "terminate" the Contract under paragraph 13(a). Although "termination" and "cancellation" have different meanings under §§ 400.2–106(3) and (4), the parties to the Contract did not use those terms in a precise manner. For instance, under paragraph 13(a), the City may terminate the agreement if "Supplier fails to perform any of the other provisions of this contract...." Because "cancellation" is the technically appropriate term where breach is involved, the parties apparently were using the terms interchangeably.

Furthermore, under paragraph 1, plaintiff agrees to sell and the City agrees to buy coal for fifteen years "subject, however, to the provisions contained in paragraph 3 hereof with reference to price adjustments and cancellation of this contract." If the City's argument is literally applied, the City would have no authority under paragraph 13 to terminate the Con-

tract because paragraph 1 only gives authority to cancel under paragraph 3. Such an interpretation would render paragraph 13 meaningless.

Because paragraph 13(a) expressly provides for notice "if the Supplier fails to perform any of the other provisions of this contract," because no exception is provided for a "cancellation" under paragraph 3(d) and because to require notice before cancellation would be entirely consistent with the good faith requirement implicit in paragraph 3(d) (§ 400.1–203, R.S.Mo.), a substantial question exists as to whether the City should have given plaintiff a paragraph 13(a) notice before cancellation under paragraph 3(d). This interpretation is consistent with the parties' expressed intent in paragraph 1 to enter into a long term agreement whereby the City is guaranteed a supply of coal insulated from market price fluctuations and plaintiff is guaranteed a long term market. If the cancellation authority under paragraph 3(d) was not subject to the paragraph 13(a) notice requirement, the effect would be a series of one year agreements rather than a fifteen year agreement with provision for yearly price adjustments.

█ The City argues that its letters of August 27, 1986, and August 28, 1986, satisfy the paragraph 13(a) notice requirement. The letter of August 27, 1986, informed plaintiff that the Contract had been cancelled by resolution of the City Council. This is not the type of pretermination notice envisioned by paragraph 13(a). In the August 28, 1986, letter the City offered to enter into negotiations with plaintiff about an "amended coal supply contract." Paragraph 13(a) requires that plaintiff be given a thirty day opportunity to correct a failure of performance, not an opportunity to negotiate a new agreement after termination.

Furthermore, even if paragraph 13(a) does not apply to paragraph 3(d), a prerequisite to cancellation under paragraph 3(d) would be a good faith analysis of plaintiff's request for an adjustment in price. § 400.-1–203. As previously discussed, the City did not analyze in good faith plaintiff's

proposed price adjustments for fiscal year 1986–87. A reasonable inference from the evidence presented is that the real reason the City sought to cancel this Contract in 1986 was because it thought it could buy coal cheaper elsewhere. Therefore, even if the City is correct that it may cancel the Contract under paragraph 3(d) without complying with paragraph 13(a), a substantial question exists whether it had a right to do so in August 1986.

### Public Interest

If a preliminary injunction is not issued, one and possibly two Midwestern coal mines will go out of business. Not only will this result in the loss of jobs for the employees involved and deal a blow to the economies in the two areas where the mines and the employees are located, but competition in the Midwestern coal industry will be further reduced.

On the other hand, if plaintiff's request for a preliminary injunction is not granted, the City of Independence may be able to purchase 73,000 tons of coal for less than the City would have to pay under the long term Contract. Certainly there is a public interest in municipalities furnishing electric power at a reasonable cost. However, the record does not furnish a basis for predicting whether purchases of coal in later years will be at lower prices than would be available under the Contract.

The balance between the potential cost savings for the City on 73,000 tons of coal against the more certain damage to competition, to the lives of mine employees and their families, and to the economies of the areas in which the mines are located, tips sharply in favor of granting a preliminary injunction.

### Conclusion

█ Where the balance of other factors in a *Dataphase* analysis "tips decidedly toward movant a preliminary injunction may issue if movant has raised questions so serious and difficult as to call for more deliberate investigation." *Dataphase*, 640

F.2d at 113. As the foregoing analysis establishes, the balance between the harm plaintiff will suffer if a preliminary injunction is not granted, and the injury the City will suffer if a preliminary injunction is granted, as well as the public interest, tips decidedly in favor of plaintiff. With the balance of equities so favoring plaintiff and because plaintiff has raised serious questions about the propriety of the City's August 25, 1986, cancellation of the Contract, this Court must intervene to preserve the status quo.

> The controlling reason for the existence of the judicial power to issue a temporary injunction is that the court may thereby prevent such a change in the relations and conditions of persons and property as may result in irremediable injury to some of the parties before their claims can be investigated and adjudicated.

*Dataphase*, 640 F.2d at 113 n. 5.

### Order

Accordingly, the City of Independence, Missouri, is hereby enjoined from taking any action inconsistent with its obligations under the September 9, 1980, Coal Supply Contract until a decision on the merits or until the City has 1) made a good faith analysis of the price adjustment figures submitted by plaintiff for the 1986–87 coal supply year; 2) held good faith discussions with plaintiff with the object of resolving any concerns about whether the price adjustment figures accurately reflect the cost of supplier's coal for the 1986–87 coal supply year; 3) given the required notice under paragraph 13(a) of the Coal Supply Contract should the City have a good faith belief after analysis of the information supporting the requested price adjustments and after discussions with plaintiff that plaintiff has failed to perform any provision of the Contract; and 4) made a reasonable, good faith determination that plaintiff has not corrected any alleged failure of performance within the thirty day period (or such longer period as the City may authorize in writing).

In the event that the City believes that it has complied with 1) through 4) above and desires to terminate the Contract before this case is tried on the merits, the City shall file a motion to dissolve the injunction before taking any action inconsistent with its obligations under the September 9, 1980, Coal Supply Contract.

The term "action inconsistent with its obligations under the September 9, 1980, Coal Supply Contract" as used above includes but is not limited to making any commitment to any other coal supplier for all or any portion of the coal that the City would have purchased under the Coal Supply Contract had the City performed its obligations under the Contract in good faith.

This preliminary injunction shall not be effective until plaintiff shall give security in the amount of $50,000.00 for the payment of such costs and damages as may be incurred or suffered by the City if it is determined that the City was wrongfully enjoined. Plaintiff shall submit the security to the City for its approval within ten days from the date of this Order. The City shall promptly advise plaintiff whether it approves or disapproves of the security. Any unresolved dispute about the approval of the proposed security shall be presented promptly to the Court.

IT IS SO ORDERED.