ASSOCIATED PRODUCERS
COMPANY, Plaintiff,

v.

CITY OF INDEPENDENCE,
MISSOURI, Defendant.

No. 86–1186–CV–W–9.

United States District Court,
W.D. Missouri, W.D.

June 19, 1987.

George P. Coughlin, Gage & Tucker, Kansas City, Mo., James D. Tack, Jr., McAfee & Taft, Oklahoma City, Okl., for plaintiff.

Cochran, Kramer, Kapke & Willerth, George E. Kapke, Kansas City, Mo., and Charles Dribben, Independence, Mo., for defendant.

ORDER GRANTING PLAINTIFF'S MO-
TION TO CLARIFY AND SUPPLE-
MENT PRELIMINARY INJUNC-
TION

BARTLETT, District Judge.

On November 14, 1986, the City of Independence, Missouri ("the City"), was preliminarily "enjoined from taking any action inconsistent with its obligations under the September 9, 1980, Coal Supply Contract ["the Contract"] until a decision on the merits or until the City" properly terminated or cancelled the Contract pursuant to its provisions. *Associated Producers v. City of Independence, Missouri,* 648 F.Supp. 1255, 1263 (W.D.Mo.1986). Plaintiff now seeks an order clarifying the injunction to require the City to purchase the minimum amount of coal stated in Schedule A to the Contract entitled "Quantity Coal Requirement—Fiscal Years 1981–1994."

The City vigorously opposes plaintiff's motion relying primarily on paragraph 4(e) of the Contract which it argues permits the maximum and minimum quantities of coal set forth in Schedule A to be adjusted in accordance with the City's need for coal as determined not less than 30 days prior to the commencement of a fiscal year. For fiscal year 1986–87, the City has decided to purchase from plaintiff less than the minimum tonnage established in Schedule A for that year. The City's purchase order of November 1986 requested shipment of 172,300 tons of coal; Schedule A sets the minimum tonnage requirement at 333,000 tons. In a letter to plaintiff accompanying the purchase order the City explained: "We consider our mutual course of dealing to have eliminated Schedule A of the coal contract and made the City's actual requirements for operation of its plants as the minimum quantity of coal that the City is required to purchase." Plaintiff's Exhibit 16.

The November 14, 1986, preliminary injunction directed the City to perform its obligations under the Contract. This order will define those obligations in one area, i.e., the amount of coal the City agreed to buy each year.

Paragraph 19 of the Contract states: "This contract is to be governed by and construed according to the laws of the State of Missouri." In Missouri, the "cardinal rule of interpretation [of contracts] is to ascertain, if possible, from the instrument itself the intention of the parties, and to give effect to that intention." *Pitcairn v. American Refrigerator Transit Co.*, 101 F.2d 929, 937 (8th Cir.1939); *see also H.K. Porter Company v. Wire Rope Corp. of America, Inc.*, 367 F.2d 653, 660 (8th Cir. 1966). In applying this rule to interpreting a contract that on its face is free from ambiguity, the Court may consider the situation of the parties and accompanying circumstances at the time the contract was entered into as an aid in determining the meaning to be given to the contract. *Cure v. City of Jefferson*, 380 S.W.2d 305, 310–11 (Mo.1964). This extrinsic evidence may not, however, be used to vary, contradict, enlarge, modify, or curtail the contract's written terms. *Press Machinery Corp. v. Smith R.P.M. Corp.*, 727 F.2d 781, 785 (8th Cir.1984).

Paragraph 1 of the Contract provides that:

> The Supplier agrees to sell and deliver as in this agreement provided and the City agrees to buy from Supplier, bituminous coal ... for the operation of the City's Blue Valley Power and Light Plant ... and the City's Missouri City Plant ... beginning on the 1st day of July, 1980, and ending on the 30th day of June, 1981, and from year to year thereafter until the 30th day of June, 1994, subject, however, to the provisions contained in paragraph 3 hereof with reference to price adjustments and cancellation of this contract.

This basic undertaking is more than just an undertaking by the City to buy coal it actually needs from year to year. In paragraph 1A, plaintiff (the supplier) agrees to:

> dedicate and set aside for this contract such quality and quantity of such coal from such sources as are required for full performance of Supplier's obligations hereunder; and Supplier will not sell nor contract to sell to others coal from such sources in quantity as to jeop-

ardize Supplier's ability to deliver the total quantity of coal that Supplier is obligated to deliver to City under this contract.

Thus, plaintiff promises to have available enough coal to fully perform its obligations under the Contract.

Paragraph 4 of the Contract and Schedule A establishes the quantity of coal that plaintiff is obligated to dedicate to the Contract and, conversely, the amount of coal the City is obligated to buy. According to paragraph 4(a), each year after fiscal year 1980–81, the *"[s]upplier shall sell and deliver to City coal in weights as shown on Schedule A* which is attached and made a part hereof by this reference." (Emphasis supplied.) Accordingly, Schedule A sets forth the amount of coal the plaintiff agrees to furnish and the City agrees to buy for each year of the Contract.

Schedule A is entitled "Quantity Coal Requirement—Fiscal Years 1981–1994." For each fiscal year the "Total Coal Requirement" is established by a range between "Minimum Tons" and "Maximum Tons." In light of the wording of paragraph 4(a), the word "requirement" must be accorded its fair meaning, i.e., the minimum amount of coal the City is obligated to buy and the maximum amount of coal plaintiff is obligated to make available. Paragraphs 4(c) and 4(d) of the Contract support this interpretation. In paragraph 4(c), the parties agree that the City may purchase coal from other sources "from time to time without impairment of the provisions of this [C]ontract." In other words, the City may buy coal elsewhere provided it has purchased at least the minimum tons established in Schedule A. Also, paragraph 4(d) provides that: "The provisions in this [C]ontract for the purchase of coal allocated for consumption at Missouri City Plant shall not be operative, *and [the] City shall not be required to purchase such allocated quantities until such time as that plant has been rehabilitated and put in service.*" [Emphasis supplied.] If the parties did not believe that Schedule A established a minimum purchase requirement for the City, then it would not have

been necessary to put into the Contract the above underlined language.

The City asserts that despite the minimum and maximum tonnages established by paragraph 4 and Schedule A, the City is authorized by paragraph 4(e) of the Contract to disregard Schedule A and to determine how much coal it wants to purchase for fiscal year 1986–87.

Paragraph 4(e) provides: "[T]the City, by action of the Council, may adjust the maximum or minimum quantities of coal to be purchased in the next ensuing fiscal year. Written notice of such adjustment in coal quantities shall be given to Supplier not less than thirty (30) days prior to the commencement of the fiscal year on which such changes will be applicable."

Read literally, paragraph 4(e) gives the City only the authority to adjust the maximum and minimum tonnages provided in Schedule A. Paragraph 4(e)'s primary function is to provide for the parties' mutual benefit a greater degree of certainty about their mutual obligations insofar as quantity is concerned shortly before the beginning of each fiscal year. The City receives greater assurance that precisely the amount of coal it needs will be available in accordance with the delivery schedule directed by the City. *See* paragraph 4(b). On the other hand, plaintiff benefits from additional specificity because it obtains a better idea of how much coal will be needed to dedicate to performance of its obligations under the Contract.

In addition, paragraph 4(e) provides the City an opportunity to adjust its purchase obligation in the event of unexpected developments at its two power plants. Implicit in the Contract is the City's undertaking to operate its Blue Valley Power & Light Plant and the Missouri City Plant for 15 years to generate power for the City. However, unexpected emergency maintenance problems at a plant could substantially reduce the need for coal to operate that plant. I say "unexpected emergency" because when the City computed the minimum and maximum tons of coal it would require under Schedule A, it planned for substantial maintenance on the Missouri

City Plant beginning in fiscal year 1987–88. A substantial reduction in the minimum and maximum tons of coal required by the Missouri City Plant is shown on Schedule A from fiscal year 1987–88 through fiscal year 1993–94. Absent an "unexpected emergency," paragraph 4(e) adjustment authority could not be used to reduce coal purchases below the minimum established in Schedule A.

That is not to say that the City could not decide to perform major work on its plants during the term of the Contract even if the work should have been foreseen when the parties entered into the Contract. However, if it chooses to do so, the City must still honor its commitment to buy the minimum tonnage established by Schedule A. Additionally, this interpretation does not preclude the City from buying power from other utilities to meet peak demand. The City may purchase power rather than purchase more than the minimum tons of coal it agreed to purchase under Schedule A.

If paragraph 4(e) is given this meaning, paragraph 4(e) is consistent rather than inconsistent with paragraphs 1, 1A, 4(a), 4(c), 4(d) and Schedule A because these provisions establish the mutual commitment of the parties to sell and deliver for each fiscal year a quantity of coal between the maximum and minimum amounts established by Schedule A.

This interpretation of paragraph 4(e) is also consistent with the intent of the parties when entering into the Contract. As stated in the November 14, 1986, order, when the parties entered into the Contract, they expected the cost of energy to increase significantly in the period from 1980 to 1995. *Associated Producers*, 648 F.Supp. at 1257. Therefore, the City entered into the Contract to obtain a guaranteed source of coal for the generation of power at its two power plants for that 15 year period at prices that would be insulated from this expected increase in the market price of coal. On the other hand, plaintiff entered into the Contract to obtain a guaranteed market for a substantial quantity of coal at a price that would fairly represent the cost of mining and delivering

the coal. A guaranteed long term market for coal permitted the mines plaintiff represented to incur the long term financing necessary for their development. As previously stated, the quantity of coal that plaintiff agreed to make available to the City and the amount of coal that the City would buy for the 15 year period was set forth in Schedule A subject to the conditions set forth in paragraph 4.

However, an example of a reason for adjusting the minimum and maximum tons provided on Schedule A that would *not* be permissible because it conflicts with the commitments the parties made to each other in the Contract would be a determination by the City that due to the changes in the price of energy since September 9, 1980, it is now more economical to buy power from other utilities than to generate power itself. Underlying the Contract is the City's commitment to a certain energy policy; to alter that commitment because the City now believes it made an improvident decision about energy policy in 1980 is inconsistent with the intent of the parties.

As the foregoing discussion demonstrates, I do not believe that paragraph 4(e) is ambiguous when read with other provisions of the Contract and in light of the intent of the parties when entering into the Contract. However, because of the generality of the language used in paragraph 4(e), an argument can be made that the meaning of paragraph 4(e) is ambiguous. "Where there is obscurity or ambiguity, however, the language should be read in light of all the surrounding facts and circumstances, including the acts of the parties indicating what interpretation was placed upon it by the parties themselves." *Pitcairn v. American Refrigerator Transit Co.*, 101 F.2d 929, 937 (8th Cir.1939); *see also H.K. Porter Company v. Wire Rope Corp. of America, Inc.*, 367 F.2d 653, 660 (8th Cir.1966).

During the first six years of performance under the Contract, the parties demonstrated their mutual understanding that the City was obligated to purchase the minimum tonnage stated in Schedule A. For instance, during the first five years of the Contract, the City in two of those years ordered precisely the number of minimum tons provided in Schedule A and in three of those years modestly exceeded the minimum tons. Rather than coincidence, I believe that the City's purchases during those five years reflects the City's understanding of its obligation under the Contract to purchase the minimum number of tons as set forth in Schedule A. In the sixth year (1985–86), the City initially ordered substantially less tons than the minimum. After negotiation, the parties agreed to an amount less than the minimum provided in Schedule A. Rather than unilaterally ordering less than the minimum, the City negotiated a reduction with plaintiff, demonstrating the parties' mutual belief in the significance of the minimum tonnage figures established in Schedule A.

*Conclusion*

Contrary to the City's argument, paragraph 4(e) does not authorize the City to lower the minimum tons of coal it will purchase because the City has found more economical ways to obtain power or because of a change in the City's energy production policy. Therefore, the City's stated intent to reduce the minimum tons of coal to be purchased under the Contract for fiscal year 1986–87 from 333,000 tons to 172,300 tons because it can purchase power generated by other utilities more cheaply than it can produce power in its power plants is inconsistent with the City's obligations under the Contract. This conclusion is even more apparent when the power being purchased is generated by the consumption of coal purchased from someone other than plaintiff. The City may terminate or cancel the Contract in accordance with paragraphs 3 and 13. Paragraph 4(e) was not intended by the parties to afford the City an opportunity to avoid its contractual obligations just because it changed its mind about an appropriate power policy.

For the foregoing reasons, it is hereby ORDERED that the November 14, 1986, order granting plaintiff's motion for preliminary injunction is amended to read as follows:

The term "action inconsistent with its obligations under the September 9, 1980, Coal Supply Contract" includes, but is not limited to: 1) making any commitment to any other coal supplier for all or any portion of the coal that the City would have purchased under the Coal Supply Contract had the City performed its obligations under the Contract in good faith; and 2) purchasing, in any fiscal year from 1980–81 through 1993–94, less than the minimum tons shown on Schedule A attached to and incorporated into the Coal Supply Contract unless the reason for doing so is not inconsistent with the terms of this Order.